CoREENE DE DONATO v. ROLLA WELLS, Receiver of UNITED RAILWAYS COMPANY of St. Louis and ST. LOUIS PUBLIC SERVICE COMPANY, Appellants.—41 S. W. (2d) 184.

Division One, July 28, 1931.

*T. E. Francis, B. G. Carpenter* and *Allen, Moser & Marsalek* for appellants.

450

*Foristel, Mudd, Blair & Habenicht* for respondent.

STURGIS, C.—The defendant street railway company has appealed from a judgment in a personal injury case in favor of plaintiff. On this appeal it stands conceded that plaintiff was injured by

defendant's negligence, and no errors are assigned on that score. The errors complained of relate to the damages awarded, and particularly to the introduction of certain expert evidence on that question in plaintiff's behalf. We need not dwell on the facts except as they relate to these questions.

The plaintiff, a young married woman, was driving an automobile which came on or near defendant's track and was struck by the rear approach of a street car on February 5, 1926. She was thrown with considerable violence from her seat against the gear shift and to the floor of the automobile, and received many abrasions, cuts and bruises. Among these was an injury to the knee and another to the shoulder. The knee injury proved quite serious, but defendant's liability for that and other direct injuries is not now questioned by defendant. By far, the most serious injury received by plaintiff, and to which the expert evidence complained of related, was to her lower abdomen and pelvic region involving the female organs; and she alleges that as a result thereof she "was caused to suffer from headaches, nervousness, weakness, dizziness, restlessness and insomnia, from nausea and vomiting spells, hemorrhage of the uterus and loss of blood; that she was threatened with an abortion, plaintiff having been pregnant at the time she sustained said injuries, and that in May, 1926, plaintiff suffered an abortion; that plaintiff suffered from pelvic abscesses and infection; that in the care and treatment of said injuries she underwent three serious and painful operations, was confined in a hospital for a period of about five weeks, and was compelled to have the operation of transfusion of blood performed upon her; that the functional use of all of said parts and organs of her body have been seriously and permanently impaired, weakened and diminished."

Plaintiff's evidence showed that on receiving her injuries the first physician who waited on her was Dr. D. L. Penny, who had her removed to a hospital for treatment. According to his evidence, he treated her there for some ten days and, though not yet well, he concluded that he could treat her as well at home and that the change would help her nervous condition. About March 1 this doctor discovered by an examination that plaintiff was suffering from a retroverted uterus, which he endeavored to correct, and he also discovered symptoms of pregnancy and recommended treatment by Dr. Royston, a specialist in obstetrics and gynecology. Plaintiff said she had been pregnant about six weeks or two months and that this was her first pregnancy. The treatment of her case was then largely turned over to Dr. Royston and he made a positive diagnosis of pregnancy about March 15. After Dr. Royston took over the case, Dr. Penny continued treating her, but, as he says, only for her stomach and nervous condition. The evidence is that

452

beginning with this accident plaintiff had suffered and continued to suffer from headache and backache, pains in the lower abdominal regions, and nauseating stomach trouble, and was in bed most of the time. As to her affliction from a retroverted uterus, this doctor said that while a blow or violence to the lower abdominal or pelvic region might cause the displacement or retroversion of the uterus, it is a fact that many women have a retroverted uterus who have never been in any accident, and that such condition may be caused by many things other than trauma or violence; that a retroverted uterus is a condition that is quite common; that a woman may have a retrovertered uterus when there is no cause whatever for it, and there are many causes other than trauma; that many women have this affliction and never know it, or have such condition for years and it is not discovered until an examination is made. He further said that plaintiff's symptoms and sufferings at that time were such as are common in pregnancy.

Dr. Royston testified that he first began treating plaintiff on March 8, 1926, when she came to his office with Dr. Penny, and that his examination of her disclosed her suffering from a retroversion of the uterus, and that he soon thereafter ascertained that she was pregnant. He did not see or treat her again till May 9, at which time she had suffered an abortion some six hours earlier at her home. He found her in bad shape, weak from loss of blood, and the birth incomplete. He had her removed to a hospital and gave her necessary medical attention and later a transfusion of blood on account of her anemic condition. Ulcerations of the uterus and surrounding organs followed and plaintiff did not leave the hospital for considerable time. He also testified that there are numerous causes for a miscarriage; that it is possible for a retroverted uterus to cause a miscarriage, although it does not do so as a rule. From his examination of plaintiff, he could not positively state what caused the miscarriage. He could not positively state what caused the retroverted uterus which he found. There are many causes and it is a common thing, but not a natural condition in women. At times it is impossible to assign a cause or reason for the condition. Ordinarily, when a miscarriage is caused by trauma, it follows shortly after the trauma, in from a few hours to several days.

A third doctor, Dr. Muench, was called in an emergency to treat plaintiff some six hours after her miscarriage on May 9 and he found the patient, as he testified, in a pool of blood, very weak and in great pain. He gave her temporary treatment, she was taken to a hospital, and he there assisted Dr. Royston in treating and caring for plaintiff during that day. He also seemed to be familiar with the history of the case and knew of her treatment and condition thereafter.

These three doctors gave plaintiff all the medical treatment she received for this injury and following, covering a period of some nine months. Their administrations and treatment of her overlapped and supplemented each other, so that each of them knew, in general at least, the history and progress of the case, the development of plaintiff's symptoms, and the treatment given her.

The most serious question in the case as presented is whether plaintiff's miscarriage on May 9 was caused by violence or trauma inflicted on her in this street car collision on February 5, more than three months prior thereto; and since plaintiff's retroversion of the womb was closely connected with and the probable cause of the miscarriage, the question of whether this condition was caused by the street car collision was inquired into and sharply contested. We have already mentioned the evidence of Doctors Penny and Muench as to the causes of retroversion of the womb other than trauma or external violence, and Dr. Royston testified that if a miscarriage follows trauma, it does not necessarily have to follow immediately after the violence is inflicted; that in his opinion it is possible for a miscarriage to follow traumatic injury as late as two or three months after the infliction of the injury. He said that on this first examination of plaintiff made on March 8, 1926, he could not discover any evidence of injury except that the patient was suffering from the displaced uterus. This condition can be brought about by many causes and he was not able to state positively what caused the condition as he discovered it on his first examination. He felt that the condition was either a congenital displacement or it was due to injury of some sort; that such condition is fairly common. He testified that the second time he saw her was a short time after her miscarriage on May 9th; that he was not able to state positively what caused the miscarriage. In most cases where a miscarriage follows trauma, the miscarriage occurs immediately following the trauma, ordinarily within a week, but sometimes within two or three weeks.

Along this same line, the defendant had Dr. Ambrose, a qualified medical expert, to make an examination of plaintiff shortly before this trial in May, 1928, and in connection therewith he obtained from her the history of the case, her symptoms, suffering, treatment, etc. He testified that it was very extraordinary, and in his opinion impossible, for a miscarriage caused by trauma, as here claimed, to have occurred as long as three months after the violence causing it; that while miscarriage is often caused by external violence, it would ordinarily occur within a week and seldom later than two or three weeks after receiving the traumatic injury.

Plaintiff herself testified that prior to the accident she was a normal, healthy woman, free from female troubles and had none of

the aches and pains, distressing symptoms and sufferings which followed the accident.

This outline of the case will, we think, enable us to understand and determine the question presented as to the admissibility of certain expert evidence offered by plaintiff. Plaintiff's theory of the case was and is that the violence of this street car impact caused the retroverted condition of plaintiff's uterus, and this, in turn, caused plaintiff's miscarriage with all its attendant and resultant suffering and disabilities. To establish this causal connection, the plaintiff propounded to each of the three doctors who had attended her in her ailments following the accident, a hypothetical question, which the court allowed each to answer. The questions are similar in form and that propounded to Dr. Royston, who was the last of the three doctors to testify, will suffice for all. This question is as follows:

"Q. Doctor, I want you to assume that on and prior to February 5, 1926, Coreene De Donato was a young lady about twenty-six years of age, and married, and was in good health, but that on that day she was pregnant for a period of about four to six weeks; and that she was seated in an automobile behind the driver's wheel on the left-hand side of the automobile, and that her automobile in which she was seated was violently struck on the side where she was seated by a street car, and the violence was of such severity that she was caused to be thrown to the right, and she landed on the floor of the automobile, and in the course of her fall or descent her body, especially the lower right quadrant of her abdomen, came in contact with the shifting lever of the automobile; that she sustained numerous bruises and contusions about her body and an abrasion of her left scapula, a severe bruise and contusion of the right patella, and a swelling of the right knee and a laceration to her right leg near the knee and the ankle, and that she was rendered unconscious, and that she was picked up out of the automobile and put on a table or a chair on the flat of her back; that there was an involuntary contraction of her right leg being pulled up upon her chest or stomach, in that direction. With the—by passive motion the leg was straightened and there was evidence of severe muscular rigidity, or muscular rigidity in the region of the right lower quadrant of the abdomen; there was some slight hemorrhage from the vagina; that a further examination revealed a swelling of the labia of the vagina on the right side and a redness of the labia of the vagina on the right side; that thereafter she was placed in the hospital, under surgical attention, kept on the flat of her back for ten days or two weeks; thereafter she was able to get up and around, but she felt more relief while she was lying down; and that about on May 6th or 7th she became very sick, and fainted with pain, so that she had to go to bed and was in bed for three days; then she suddenly aborted and a

foetus appeared of about four to five months old. I want you to assume all of those facts, and *eliminate any other cause;* I want you to state whether or not, in your opinion, I want you to state, in your opinion, what caused this miscarriage or abortion?"

To this question defendant's counsel objected as follows:

"Now, if the Court please, I object to that. That question, of course, what he says, eliminates every other cause; it makes it only where there can be only one answer; if you eliminate everything else, why of course the necessary answer is that the facts stated in the hypothetical question caused it, and I object to it; that is not a proper question; invades the province of the jury."

After a colloquy between court and counsel the court asked defendant's counsel: "Anything to suggest?" and defendant's counsel stated:

"No, except that I say it isn't proper to include in the question eliminating every other cause; that is certainly not proper. It is manifest if you eliminate everything else, well, then the answer is that is the cause. Eliminate every other cause."

When this question was propounded to Dr. Penny, the first witness, the defendant called attention to the fact that this witness was not an ordinary expert called to answer hypothetical questions, but was the attending physician, having personal knowledge of the matters hypothesized, and that the form of the question was not proper as to him. That witness answered: "This accident was the cause of the miscarriage." When the same question was repeated to Dr. Muench, the objection was made "that it was not a proper question to put to this doctor—to eliminate every other cause and then say what is the cause." The court then raised the question whether this hypothetical question did not invade the province of the jury, and the attorney asking it said: "I want to ask, Doctor, if in your opinion you could state what caused this miscarriage," to which the Doctor replied: "Eliminating every other cause?" and the attorney said, "Yes." The witness then answered: "I should say, assuming that those are the facts, that the abortion would be caused by the accident." The defendant moved to strike out this answer for the reason "that it is an improper question to say eliminate every other cause, for there can be but one answer, necessarily." When the question was propounded to Dr. Royston, the objection made was: "The question, of course, what he says, eliminates every other cause; it makes it so there can be only one answer; if you eliminate everything else, why of course the answer is that the facts stated in the hypothetical question caused it."

The contention of the defendant here is that this hypothetical question calling for an answer that the accident in question caused plaintiff's retroversion of the womb and miscarriage, containing

therein the clause directing the witness to eliminate every other cause, was erroneous and prejudicial. We have mentioned the objections made and the court's rulings thereon at some length in reply to plaintiff's contentions that the objections to this evidence presented here were not properly raised at the trial. Such suggestions are without merit.

When we consider the hypothetical question propounded to each of the three doctor witnesses, it is apparent that if the eliminating clause be taken literally, then only an affirmative answer, as to the accident being the cause, was possible. In other words, if the accident happened and plaintiff's injuries, including a miscarriage, followed, and all other causes are eliminated, then the accident must have been the cause. One of the doctors evidently took note of this eliminating clause and before answering, as if to make sure of the matter, asked if he was to eliminate all other causes, and was instructed to do so.

It is insisted, however, that the witnesses were not misled into a belief that only one answer was open to them, and that they answered the hypothetical question intelligently; that the clause eliminating all other causes merely meant to call their attention to the fact that the evidence disclosed no other *trauma or violence* to the plaintiff which would bring about this result. The form of the question, however, would not merely eliminate any other traumatic cause, but any other cause whatever. The evidence of these same expert witnesses showed that retroversion of the womb and miscarriage were by no means confined to traumatic causes, but resulted from many causes and was common among women without any known or discoverable cause. The fact that if it was caused by trauma, the result generally, if not always, followed in a much shorter time than on this occasion, made it doubtful at least whether plaintiff's condition in this respect had a traumatic cause.

The serious objection to this eliminating clause of the hypothetical question is that it restricted and limited the witness in taking into consideration all his knowledge touching the cause of plaintiff's miscarriage. The chief value of expert evidence lies in the fact that the witness possesses superior knowledge of the subject under consideration, and by reason of his study, training and experience he is able to discern and trace the causal connection, if any, between successive events and can aid the jury in determining whether the claimed injury is the result of the alleged cause or may have a different cause. Certainly the witness should be left free in the exercise of all his faculties in so doing and should not be told to exclude matters which may be important. Here the witnesses were the three doctors who had examined and treated plaintiff for her

ailments and had personal knowledge of practically all the facts covered or which should have been covered by the hypothetical question. It is proper for a medical expert to testify and give his opinion either from facts within his own knowledge and observation or from hypothetical facts, or from the two combined. [22 C. J. 639; Patterson v. Traction Co., 178 Mo. App. 250, 259.] It is also well to keep in mind that "the governing rule deducible from the adjudicated cases seems to be that the subject must be one of science or skill, or one of which observation and experience have given the opportunity and means of knowledge which exist in reason rather than descriptive facts, and, hence, cannot be intelligently communicated to others not familiar with the subject so as to possess themselves of a full understanding of it." [Benjamin v. Street Railway Co., 50 Mo. App. 602, 609.] Where the witness has personal knowledge or observation, a hypothetical presentation is unnecessary. [City of Aurora v. Insurance Co., 180 Mo. App. 263, 271.] It would also seem obvious that where the witness's opinion is based on and supported by his personal observation and knowledge, it is more likely to be correct than when the facts are merely hypothetical. In the former case, not only is his superior knowledge, training and experience exercised in forming a correct conclusion from the facts, but also in discovering and correlating the material and relevant facts. In doing this the witness should be left untrammelled and not told to exclude a cause or causes which to the trained mind is important and material in arriving at an ultimate conclusion. In B. & O. Railway Co. v. Tindall, 47 Fed. (2d) 19, the court said that in determining whether an injury was caused by an accident or by an infection, "the expert's opinion to be of value should include both possible causes."

Moreover, a hypothetical question should include all the facts essential to the theory of the party propounding it, and "undisputed facts, when material, must always be assumed." [22 C. J. 711; Hahn v. Hammerstein, 272 Mo. 248, 262.] Here the evidence was undisputed that retroversion of the uterus and miscarriage have numerous causes and frequently occur without any known cause; and while the expert witnesses cannot be said to agree that such cannot take place as long as three months after the traumatic cause, yet all agree that such an occurrence is so unusual as to suggest, if not impose, a belief in a different cause.

We hold, therefore, that the court erred in not sustaining defendant's objections to the hypothetical question mentioned. This view of the case renders it unnecessary to rule on other questions presented.

The judgment is therefore reversed and cause remanded for new trial in accordance with this opinion. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All of the judges concur.