## INDEPENDENT SCHOOL DISTRICT NO. 35, ST. LOUIS COUNTY, v. A. HEDENBERG AND COMPANY, INC. AND ANOTHER.[1]

January 2, 1943.

No. 33,221.

[1]Reported in 7 N. W. (2d) 511.

*Fryberger, Fulton & Boyle,* for appellants.
*M. J. Mulvahill,* for respondent.

STREISSGUTH, JUSTICE.

Action for breach of contract for the construction of a gymnasium for plaintiff school district. Plaintiff recovered a verdict for $6,000, and defendants, contractor and surety, appeal.

The asserted breach of contract consisted in (1) the failure to

lay brick in the manner specified, and (2) the failure to completely fill the joints between bricks with mortar. It is claimed that the walls were thereby caused to leak, especially during and immediately after heavy rainfalls.

The brick walls were built in four tiers. The specifications required that common brick be so laid that every sixth course be a full header course anchored in or bonded to the adjoining tier and that face brick be so laid that every third course have alternate headers and stretchers.[2] Face brick were required to be laid with close shoved joints completely filled with mortar, as contrasted with joints only "buttered" on the outside edges of the bricks.

The gymnasium was completed late in the spring of 1939, the final payment being made in May of that year and the building formally accepted on June 20. In August 1939, following a heavy rainfall, it was discovered that the walls leaked so extensively as to form large pools of water on the gymnasium floor and as to suggest sieves instead of impervious walls. Eight pails were put on the floor to catch the water flowing from a single recess in the wall. In other places water trickled down the inside walls in sizable streams. After discovery of the leaks, experiments made with a garden hose showed that water readily flowed from the exterior into the interior at many places. The leaking of the walls caused doors to swell and floors to warp, and the building had a musty odor.

Following the discovery of the leaky walls, the school board on August 23, 1939, wrote the contractor requesting that it appear before the board on August 28. In response, one Farnam, the contractor's construction foreman, appeared and discussed with the board the leaks and the cause thereof. He insisted that the gymnasium was built according to specifications and that the leaks were due to the concrete bricks selected by the board and which the contractor was directed to use. He finally told the

---

[2]Headers are bricks with their ends toward the face of the wall. Stretchers are bricks with their lengths parallel to the face. See illustrations in Webster's New International Dictionary under "bond."

board: "You got just what you asked for," and walked out. The architect was not present at the meeting; in fact, he had been previously paid off and discharged. No demand was made then or later by either party for arbitration to fix the blame or to determine the extent of the damage.

Subsequently the board wrote one Joseph A. Wise of the University of Minnesota, an expert, for advice. Wise replied, apparently suggesting several possible causes and recommending a complete and thorough inspection of the walls. His reply was submitted to the architect, Thomas J. Shefchik, for his reaction. On September 29, 1939, the architect wrote a letter to the secretary of the school district in which, *inter alia,* he said:

"About the only thing that the School Board would gain by * * * an investigation would be the definite establishment of the cause of the leak. If the fault lies in the brick then, of course, that would end the entire matter because the School Board definitely purchased the brick on their own responsibility. Should it develop that the mortar is at fault then, of course, the Board would have recourse against Mr. Hedenberg; although I have my grave doubts as to the success of any action taken against him because a careful visual examination of the mortar suggests an A-1 job."

An inspection by Mr. Wise and other experts revealed that many of the joints between the bricks were merely "buttered," the mortar extending to a depth of only one-half or three-quarters of an inch instead of to the full four-inch depth of the brick as required. What appeared on the outside of the wall to be header bricks were, in many instances, brick bats, which did not extend through to the next tier or bind the two tiers together. There were many wide and open spaces between the several tiers of brick.

Notwithstanding the inspection, the dispute continued unsettled for over a year without a request or demand, either oral or written, by either party for a formal decision of the architect or for arbitration. Not until December 13, 1940, was this action for

damages for breach of contract begun. Defendants incorporated in their separate answers article 20 of the "general conditions" of the contract, hereinafter quoted, but made no demand therein for arbitration; nor did they at any time during the progress of the litigation make such demand or move for a stay of the court proceedings to permit arbitration.

As their principal defense, the contractor and its corporate surety relied upon certain contract provisions relating to arbitration found in the "general conditions." They urged that under these provisions a decision of the architect and a submission to arbitration were conditions precedent to any court action. A reference to the pertinent provisions is therefore essential. They are as follows:

"ART. 20. CORRECTION OF WORK AFTER FINAL PAYMENT.—Neither the final certificate nor payment nor any provision in the Contract Documents shall relieve the Contractor of responsibility for faulty materials or workmanship and, unless otherwise specified, he shall remedy any defects due thereto and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of substantial completion. The Owner shall give notice of observed defects with reasonable promptness. All questions arising under this article shall be decided by the Architect subject to arbitration.

\* \* \* \* \* \*

"ART. 25. CERTIFICATES OF PAYMENTS.—\* \* \*

"No certificate issued nor payment made to the Contractor, nor partial or entire use or occupancy of the work by the Owner, shall be an acceptance of any work or materials not in accordance with this contract. The making and acceptance of the final payment shall constitute a waiver of all claims by the Owner, other than those arising from unsettled liens, from faulty work appearing after final payment or from requirement of the specifications, \* \* \*.

\* \* \* \* \* \*

"ART. 31. DAMAGES.—If either party to this Contract should suffer damage in any manner because of any wrongful act or neg-

lect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damage.

"Claims under this clause shall be made in writing to the party liable within a reasonable time at the first observance of such damage and not later than the time of final payment, except as expressly stipulated otherwise in the case of faulty work or materials, and shall be adjusted by agreement or arbitration.

\* \* \* \* \* \*

"ART. 39. ARCHITECT'S DECISIONS.—The Architect shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents.

"The Architect's decisions, in matters relating to artistic effect, shall be final, if within the terms of the Contract Documents.

"Except as above or as otherwise expressly provided in the Contract Documents, all the Architect's decisions are subject to arbitration.

"ART. 40. ARBITRATION.—*All questions subject to arbitration under this Contract shall be submitted to arbitration at the choice of either party to the dispute.*

"\* \* \* Should the party demanding arbitration fail to name an arbitrator within ten days of his demand, his right to arbitration shall lapse. \* \* \*

"If there be one arbitrator his decision shall be binding; if three the decision of any two shall be binding. *Such decision shall be a condition precedent to any right of legal action,* and wherever permitted by law it may be filed in Court to carry it into effect." (Italics supplied.)

■ The question whether the contractor was at fault was never "decided by the architect" within the meaning of article 20. The decision thereby contemplated is a final and not a mere tentative or informal one. The letter of the architect, from which we have quoted, was properly excluded as evidence. It indicated on its face that the architect had made only a "visual examination of the

mortar" and that the letter was not intended to be his final decision as to the quality of the mortar, much less as to compliance with the specifications relating to header bricks and to slushed joints. Nor was the letter admissible as an admission on the part of the school district, for, under a distinct provision of the contract, the architect was not the agent of the owner but "the interpreter of the conditions of the contract and the judge of its performance."

■ Article 20 obviously was intended to apply to remedial defects appearing after *"substantial completion"* and the issuance of the final certificate. It required the correction of such defects if so "decided by the Architect," without the necessity of resorting to a claim for damages under article 31. But the owner, in addition to his right under article 20 to have "defects due" to "faulty materials or workmanship" remedied, with payment "for any damage to other work resulting therefrom," also had the right, under article 25, to assert "claims * * * arising from * * * faulty work appearing after final payment"; and, under the express provisions of article 31, if the owner suffered "damage in any manner because of any wrongful act or neglect of the other party," he was entitled to be "reimbursed by the other party for such damage," including damage "in case of faulty work or materials," subject to the further provision that such claims "shall be adjusted by agreement or arbitration."

Construing the three articles together, it is clear that the remedies of the owner for "faulty materials or workmanship" discovered after final payment included (1) correction of defects with compensation for "damage to other work" and (2) a claim for damages. Only if the owner sought the former remedy was a decision of the architect necessary. Where, as was his right, the owner asserted a claim for damages instead of insisting that the defect be remedied, a decision by the architect was unnecessary, though a dispute in either case was "subject to arbitration" within the meaning of article 40.

 Article 40 created a valid and enforceable right in either party to have the owner's claim for damages for faulty work or materials appearing after final payment, as well as other questions, *"submitted to arbitration at the choice of either party to the dispute."* The agreement to arbitrate was not irrevocable in the sense that it could not be modified by mutual agreement or waived by mutual acquiescence of the parties in submitting their controversy to a court of law. The word "irrevocable," even as used in an arbitration statute, means that the contract to arbitrate cannot be revoked at the will of one party over the objection of the other, but that it can only be set aside for facts existing at or before the time of its making, which would permit revocation of any other contract. Zimmerman v. Cohen, 236 N. Y. 15, 139 N. E. 764.

Article 40 gave either party initially the right to insist on arbitration of any dispute, but the clause was not self-executing. Arbitration could come into being only *"at the choice of either party."* Like other clauses in the contract, the arbitration clause might be modified, rescinded, or waived by agreement or acts and conduct of the parties. Here both parties wholly disregarded the clause for over a year. The school district definitely repudiated it by bringing suit without arbitration. Each defendant joined in the repudiation by answering to the merits without a demand for arbitration or a motion to stay the suit until arbitration was had. Under an almost uniform line of decisions construing similar contracts, such conduct on the part of the parties constituted an abandonment or waiver of the right to arbitration and a consent to the submission of the controversy to the courts. Annotation, 117 A. L. R. 304; Dec. Dig., Contracts, Key No. 292½; Landreth v. South Coast Rock Co. 136 Cal. App. 457, 29 P. (2d) 225; Palmer v. Fix, 104 Cal. App. 562, 286 P. 498; Pneucrete Corp. v. U. S. F. & G. Co. 7 Cal. App. (2d) 733, 46 P. (2d) 1000; California P. & A. Growers v. Jaggers W. G. Co. 85 Ind. App. 506, 150 N. E. 317; Gere v. Council Bluffs Ins. Co. 67 Iowa 272, 23 N. W. 137, 25 N. W. 159; Conrad v. Humphrey, 84 S. W. 313, 27

Ky. L. Rep. 4; Hutchinson v. Liverpool & L. & G. Ins. Co. 153 Mass. 143, 26 N. E. 439, 10 L. R. A. 558; Matter of Bullard v. Grace Co. Inc. 240 N. Y. 388, 148 N. E. 559; Gnau v. Mason's P. A. Assn. 109 Mich. 527, 67 N. W. 546; Nurney v. Fireman's F. Ins. Co. 63 Mich. 633, 30 N. W. 350, 6 A. S. R. 338; Webster v. Van Allen, 217 App. Div. 219, 216 N. Y. S. 552; Zimmerman v. Cohen, 236 N. Y. 15, 139 N. E. 764; Sinclair v. Tallmadge, 35 Barb. (N. Y.) 602; Wright v. Susquehanna Mut. F. Ins. Co. 110 Pa. 29, 20 A. 716; Ryan v. Reed Air Filter Co. 11 Tenn. App. 472; McNeff v. Capistran, 120 Wash. 498, 208 P. 41; *The Belize* (D. C.) (N. Y.) 25 F. Supp. 663; William S. Gray & Co. v. Western Borax Co. Ltd. (9 Cir.) 99 F. (2d) 239; Radiator Specialty Co. v. Cannon Mills, Inc. (4 Cir.) 97 F. (2d) 318, 117 A. L. R. 299; La Nacional Platanera v. North American F. & S. S. Corp. (5 Cir.) 84 F. (2d) 881.

This rule is not new to our state. In Meyer v. Berlandi, 53 Minn. 59, 54 N. W. 937, decided in 1893, this court held that the parties to a construction contract, having proceeded throughout the entire course of their dealings with each other in entire disregard of the provision of the contract regarding the mode of determining by arbitration the value of the extras, thereby waived such provision.

The further clause in article 40 here under discussion, that the arbitrator's decision "shall be a condition precedent to any right of legal action," does not alter the rule as to waiver where the right to arbitrate itself is optional. The clause is itself dependent upon the clause in reference to arbitration, the choice of which rests on either party. The "condition precedent" clause is as binding on one party as on the other, but it may, along with the arbitration provision, be waived expressly or by implication. For, if the agreement to arbitrate never becomes operative, the agreement not to sue without arbitration, being dependent upon the agreement to arbitrate, also remains inoperative. 3 Am. Jur., Arbitration and Award, p. 887, § 56; Annotation, 117 A. L. R. pp. 301, 302; Kahnweiler v. Phenix Ins. Co. (8 Cir.) 67 F. 483, 14

C. C. A. 485, 32 U. S. App. 230, reversing (8 Cir.) 57 F. 562; Crilly v. Philip Rinn Co. 135 Ill. App. 198; Manchester P. Assur. Co. v. Koerner, 13 Ind. App. 372, 40 N. E. 1110, 41 N. E. 848, 55 A. S. R. 231; Nurney v. Fireman's F. Ins. Co. 63 Mich. 633, 30 N. W. 350, 6 A. S. R. 338; Phoenix Ins. Co. v. Badger, 53 Wis. 283, 10 N. W. 504; Wallace v. German-American Ins. Co. (8 Cir.) 41 F. 742.

The test for determining whether there has been a waiver in a particular case is stated by the author of an exhaustive annotation in 117 A. L. R. p. 304, as follows:

"Any conduct of the parties inconsistent with the notion that they treated the arbitration provision as in effect, or any conduct which might be reasonably construed as showing that they did not intend to avail themselves of such provision, may amount to a waiver thereof and estop the party charged with such conduct from claiming its benefits."

At the time the instant action was instituted, Park Const. Co. v. Independent School Dist. 209 Minn. 182, 296 N. W. 475, had not been decided, and the decision law of this state based on Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, was that an agreement to submit all future controversies under a contract to arbitrators was void as against public policy because it deprived the parties of access to the courts. Counsel for the contractor frankly admitted that because of the state of the Minnesota law existing at the time the action was commenced they concluded that the contractor would have no right to arbitrate the question of liability *vel non,* but only the question of damages. While this fully explains the reason for not asking for submission to arbitration, it is not a substitute for an actual demand or request for arbitration.

Article 20 was set out verbatim in defendants' answers, but the allegation was not accompanied by a further allegation that arbitration had been demanded by either party prior to suit or was presently being demanded by defendants. There was no reference whatsoever to article 40. Article 20 was incorporated in the answers solely as supporting the further allegations that "no defect

* * * appeared within a period of one year" and that plaintiff failed entirely to give them notice of defects and that "the architect * * * has decided that * * * defendant has fully performed said contract in a good and workmanlike manner and said architect has made no finding" to the contrary. At the opening of the trial, objection was made to the introduction of any evidence "on account of provisions in the contract which require a decision of the architect on any alleged faulty material or workmanship, leaving to the parties the right to arbitration of said decisions." The defenses so alleged and the objection so made have been disposed of by our discussion of article 20.

The decisive facts here are that both parties from the inception of their dispute proceeded in entire disregard of the provisions of the contract relating to arbitration and that neither at any stage of such dispute, either before or after commencement of the action, demanded arbitration, either by oral or written demand, pleading, or otherwise. Their conduct was as effective a rejection of the right to arbitrate as if, in the best Coolidge tradition, they had said, "We do not choose to arbitrate." As arbitration under the express provisions of article 40 was "at the choice of either party," and was chosen by neither, a waiver by both of the right to arbitration followed as a matter of law.

■ Having disposed of the arbitration issue, we turn to the question of substantial performance. Whether there is substantial performance is usually a question of fact. Service & Security, Inc. v. St. Paul F. S. & L. Assn. 211 Minn. 199, 203, 300 N. W. 811; Snider v. Peters Home Bldg. Co. 139 Minn. 413, 167 N. W. 108; Brown v. Hall, 121 Minn. 61, 140 N. W. 128; Elliott v. Caldwell, 43 Minn. 357, 45 N. W. 845, 9 L. R. A. 52. Under the evidence in this case, the court had no alternative but to submit the issue.

While the contractor sought to avoid responsibility for the leaky condition of the building by asserting that the leaks were due to the use in certain places of cement bricks selected by the school board, yet the evidence actually introduced was amply sufficient

to justify, if not to impel, a finding by the jury that there had been no substantial compliance with the contract, but, on the contrary, actual fraud and collusion between the contractor and the inspectors.

Nor, as we have heretofore pointed out, was the remedy provided for by article 20 the exclusive remedy of the owner school district upon discovery of the defects. That article was intended to cover a situation where there were minor or remedial defects discovered after "substantial completion." The defects here complained of were not necessarily such as could be corrected so as to comply with the specifications without reconstruction of the entire wall. True, the joints were repointed, but whether such repointing provided the same imperviousness to moisture as a solid mortar joint extending the entire depth of the brick was a serious question.

Even should the variance from the specifications be considered a minor defect, the owner was, nevertheless, under article 31, entitled to assert a claim for damages instead of accepting repairs. But his damage in such case would be limited to the cost of repairs. The rule is that if defects are minor and of a character which may be so remedied that the owner will have what he contracted for, the contractor may recover the agreed price less such sum as will cure the defects. Service & Security, Inc. v. St. Paul F. S. & L. Assn. 211 Minn. 199, 204, 300 N. W. 811; Snider v. Peters Home Bldg. Co. 139 Minn. 413, 167 N. W. 108, *supra;* 2 Dunnell, Dig. & Supp. § 1850. Here the contractor had been paid in full and the owner was not in a position to reject the building or withhold the contract price; hence the owner's simplest remedy was a suit for damages.

■ The court in its instructions correctly defined substantial performance and further explained that if there was substantial performance and the defects in the building were of a character which could be remedied, the measure of damages was such amount as would cure the defects; but that in case the jury found the defects were such as to prevent a substantial performance, the

measure of damages was the difference between the market value of the building constructed according to plans and its market value as actually constructed by the defendant. The instructions were a correct exposition of the law. Snider v. Peters Home Bldg. Co. 139 Minn. 413, 167 N. W. 108, *supra*.

■ Citing 66 adverse rulings, defendants assert that the trial court had prejudged the case and deprived them of a fair trial. We have examined the lengthy record with care and find that defendants' assertion that the trial judge had predetermined the issues and persistently favored the school district in his rulings is wholly without support. It would be a real innovation to our system of jurisprudence to require that a court's rulings, favorable as well as adverse, should be distributed equally between opposing litigants.

An impartial review of the record, however, shows that the rules of evidence were applied as against both parties with an inflexibility not to be entirely approved. The only rulings on evidence which require special comment are those in connection with opinion evidence of one Johnson, an expert witness called on behalf of defendants to establish that the leaks in the gymnasium were not due to improper masonry but to the expansion and contraction of cement bricks selected by the board and laid, according to specifications, without customary expansion joints.

Johnson was a construction inspector of Duluth and had held that position for over 15 years. Prior to such employment he had had ten years' experience in bricklaying, three years' experience in building furnaces out of bricks as well as cement blocks, two years' experience with coke ovens, and four years' experience with various building contractors on large buildings and plants of various types. He had completed a four-year course in Carnegie Institute of Technology and held the degree of Bachelor of Science for building construction. To complete his education, he had taken three years of University Extension work confined largely to courses in studying the behavior of various building materials, particularly concrete. Clearly, he was eminently qualified to

testify as an expert as to the cause of the leaks in the gymnasium here involved.

Shortly after the leaky walls were discovered, Johnson, together with Joseph A. Wise of the University of Minnesota, heretofore mentioned, had made a complete and thorough examination of the gymnasium from a scientific point of view for the purpose of determining, if possible, the cause of the leaks for the benefit of the building profession. Johnson testified in detail as to the examination he and Wise had made, and particularly in reference to many cracks which he had found in the walls of the building. He was then asked: "Do you have an opinion as to the cause of such cracks as you have described?" An objection of "no proper foundation" was made, which the court sustained, stating: "I don't think there is any foundation laid as yet * * * *unless you base it on the testimony that has already been given* [by other witnesses]." In an effort to comply with the court's suggestion, counsel then asked the witness whether he had been in the court-room and heard the testimony of the other witnesses, to which Johnson replied that he had been there throughout the trial except for one session thereof. We quote further excerpts from the record:

"Q. * * * I would like to have you give us your opinion as to the cause of the cracks which you have described and which you found in the walls of the addition to the Buhl high school, the gymnasium.

* * * * * *

"The Court: Well, you will have to base it on the testimony and his examination, of course. * * * He will have to assume to be true the testimony he has heard and then base his answer on what he has heard and what examination he made of the building in answering this hypothetical question.

* * * * * *

"Q. And is your opinion based upon your examination and observation of the walls?

"A. Yes, and also my knowledge of the behavior of the material—

\* \* \* \* \* \*

"Q. All right, now what is that opinion?"

Here counsel for plaintiff interrupted and asked, *inter alia:* "If you answer this question, are you taking it as true that some of the bricks in this outside facing wall only had a shell of from a quarter to three-quarters of an inch of mortar and back behind that narrow shell of mortar was a vacant space?" to which the witness answered: "No. \* \* \* I won't assume that." He was then asked by defendants' counsel:

"Q. Well, did you make a sufficient examination of your own, an examination of that wall, to form an opinion as to the cause of the leaking, without relying upon the testimony of others?

\* \* \* \* \* \*

"The Court: Well, he will have to take into consideration the testimony that has been given if you are to qualify him as an expert, Counsel, and he refuses to so answer the questions. *I think he has disqualified himself.*

"Mr. Boyle: \* \* \* I would like to have him testify as to whether or not from his own examination he can form an opinion as to the cause of the leaking.

"The Court: I take it the reason he was in court here was to listen to the testimony so you could qualify him as an expert and he now tells us, if I understand him, that he cannot assume some things to be true that have been testified to as to the condition of certain joints in that building.

"Mr. Boyle: \* \* \* there is already some conflict in the testimony; he would have to take that with the knowledge he already has.

"The Witness: Yes, I understand—

\* \* \* \* \* \*

"Q. Mr. Johnson, do you have an opinion as to the cause of the cracks which you observed in the wall when you examined those walls in October 1939?

"A. Yes.

"Q. What is your opinion in that regard?

⁎ ⁎ ⁎ ⁎ ⁎ ⁎

"Mr. Mulvahill: We will object to that as no proper foundation.

"The Court: *The objection is sustained unless he will assume as true the testimony heretofore given regarding the condition of this wall.*" (Italics supplied.)

The court's rulings were clearly erroneous. The witness had not only shown himself qualified but had testified extensively as to the facts found upon his own investigation. He had personally made a sufficient examination of the building to give his opinion without reference to the testimony of other witnesses, which explains his statement that he could not assume their testimony to be true.

Since hypothetical questions based on assumed facts are merely a substitute for personal observation (2 Wigmore, Evidence [3 ed.] p. 796, *et seq.,* §§ 674, 675, 679), the rule requiring the statement of hypothetical facts to an expert witness has no application to questions calling for the conclusion of one who has personal knowledge of the subject of the inquiry. If the witness is acquainted with the facts of the case—that is, if he has personal knowledge or has made personal observations—he may give his opinion upon the basis of his knowledge and observations in response to direct interrogation. 3 Jones, Commentaries on Evidence (2 ed.) p. 2438, § 1333; Skelton v. St. Paul City Ry. Co. 88 Minn. 192, 92 N. W. 960; De Donato v. Wells, 328 Mo. 448, 41 S. W. (2d) 184, 82 A. L. R. 1331; City of Aurora v. Firemen's F. Ins. Co. 180 Mo. App. 263, 165 S. W. 357; Annotation, 82 A. L. R. p. 1338.

The language of the court in Bellefontaine & I. R. Co. v. Bailey, 11 Ohio St. 333, 337, is especially pertinent:

"Undoubtedly, if the witness had been a stranger to the actual facts, it would then have been necessary to assume a state of facts as the foundation of any opinion he might give; but no such as-

sumption, it seems to us, is necessary when the witness is, or is properly presumed to be, himself personally acquainted with the material facts of the case * * *. If an expert may give his opinion on facts testified to by others, we see no reason why he may not do so on facts presumably within his own personal knowledge; and if his knowledge of any material fact be wanting or defective, the parties have ample opportunity to show it by cross examination, and by testimony *aliunde.*"

Even where a hypothetical form of question is used, it need not include any particular number of facts. As said in 2 Wigmore, Evidence (3 ed.) pp. 805, 807, § 682:

"The questioner is entitled to the witness' opinion on any combination of facts that he may choose. It is often convenient and even necessary to obtain that opinion upon a state of facts falling short of what he or his opponent expects to prove, because the questioner cannot tell how much of the testimony the jury will accept; and if proof of the whole should fail, still proof of some essential part might be made and an opinion based on that part is entitled to be provided for the jury. For reasons of principle, then, and to some extent of policy, the natural conclusion would be that the questioner need not cover in his hypothesis the entire body of testimony put forward on that point by him or by the opponent, but may take as limited a selection as he pleases and obtain an opinion on that basis. Such is the orthodox doctrine as applied by most Courts."

It is for examining counsel to decide whether the expert's opinion should be based upon facts within his personal knowledge and testified to by him, or upon a hypothetical presentation of the testimony of other witnesses as to facts they observed, or in part upon each form of data. Masteller v. G. N. Ry. Co. 103 Minn. 244, 114 N. W. 757; De Donato v. Wells, 328 Mo. 448, 41 S. W. (2d) 184, 82 A. L. R. 1331, *supra;* 2 Wigmore, Evidence (3 ed.) p. 798, § 678; 22 C. J. 639; Annotation, 82 A. L. R. pp. 1338, 1339.

Through failure of the trial court to perceive these distinctions

between testimony of an expert testifying on the basis of his own observations and one testifying on the basis of observations of others, substantial error, prejudicial to defendants, occurred, and there must be a new trial.

■ The error was not cured nor rendered harmless by the fact that on the following day counsel framed a hypothetical question reciting in detail the testimony of the other witnesses, in answer to which Johnson expressed his opinion that the leakage was due to cracks, shrinkage, and absorption of the material itself and not to any fault in the laying of the bricks or the spreading of mortar.

The bloom was already off the peach so far as Johnson's testimony was concerned. The weight of his opinion had already been effectively reduced, if not totally destroyed, by the court's statement that he had "disqualified himself."

The defendants were entitled to the benefit of the expert's opinion based on his own investigation and nothing more, if they chose. The witness should have been left untrammeled and not told to include facts asserted by others which to his trained mind were unimportant and immaterial.

The chief value of Johnson's opinion lay in the fact that he possessed superior knowledge of the subject under consideration, and by reason of his study, training, and experience was able to discern from his own investigation and observations the causal connection between the leaky walls and the materials used and work performed in constructing them. Being wholly disinterested, he was in a position to aid the jury materially in determining what the exact cause of the leaks was, and he should have been left free in the exercise of all his faculties in so doing, without being told by opposing counsel or the court to include facts testified to by others which he did not deem important, or which, from his own investigation, he could not assume to be true.

As said in De Donato v. Wells, 328 Mo. 448, 457, 41 S. W. (2d) 184, 187, 82 A. L. R. 1331, *supra:*

"Where the witness's opinion is based on and supported by his personal observation and knowledge, it is more likely to be correct

than when the facts are merely hypothetical. In the former case, not only is his superior knowledge, training and experience exercised in forming a correct conclusion from the facts, but also in discovering and correlating the material and relevant facts."

To the same effect is Morewood v. Enequist, 64 U. S. (How.) 491, 16 L. ed. 516.

While the doctrine of harmless error is favored and will be applied whenever it seems reasonable or safe to do so (5 C. J. S., Appeal and Error, p. 812, § 1677), it is not a cure-all. In their desire to sustain what appears to be a just verdict, courts should not strain the doctrine beyond its legitimate function. Error in the admission or rejection of expert opinion, or any other type of evidence, is ground for reversal if it is prejudicial. 3 Am. Jur., Appeal and Error, p. 592, § 1036.

Regardless of the degree of our approval of the verdict here as based on the evidence actually introduced at the trial, it would be the purest speculation for us to say that the jury might not have reached a different result, either on the merits or as to the amount of their verdict, had defendants' principal witness been given the freedom to which he was entitled in expressing his own opinion on the basis of his own inspection and observation. Even if his unshackled testimony had not exonerated the contractor completely, it might conceivably have reduced the size of the verdict. Hence its exclusion was prejudicial. Wolf v. C. M. St. P. & O. R. Co. 180 Minn. 310, 230 N. W. 826.

Reversed and new trial granted.