Louise GULLEY (Plaintiff), Respondent,

v.

Frank SPINNICHIA (Defendant), Appellant.

No. 30422.

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1960.

William B. Anderson, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for appellant.

Roscoe B. Turner, St. Louis, for respondent.

RUDDY, Judge.

This is an action for damages for personal injuries alleged to have been sustained by plaintiff when the automobile she was driving was struck by an automobile operated by defendant. The verdict and judgment were in favor of plaintiff in the amount of $5,000. Defendant appealed.

Defendant raises no issue bearing on the question of liability. He confines his statement of alleged errors of the trial court to matters involving the damages awarded. However, he does contend that the cause should be reversed and remanded for a new trial on all issues. For this reason we state the facts relating to the collision of the two automobiles.

The only witnesses who testified to the circumstances of the collision were plaintiff and defendant. The only undisputed facts are that the accident occurred between four and five P.M. on May 6, 1955, at or near 18th and Market Streets in the City of St. Louis, while plaintiff and defendant were driving their respective automobiles eastwardly on Market Street, which street had three traffic lanes for eastbound traffic with a similar number of lanes for westbound traffic. The traffic lanes were indicated by painted lines on the street pavement. The streets were dry and there was a slight incline in Market Street as the cars approached 18th Street. In all other respects the testimony of plaintiff and defendant as to how and when the collision occurred is in dispute.

Plaintiff testified that she was traveling in the middle lane of the three eastbound lanes, and as she proceeded eastwardly along Market Street between 20th and 18th Streets, there was a mail truck directly in front of her and she could recall no other traffic "moving in an eastward direction." The intersection of 18th and Market Streets was protected by electric signal lights and plaintiff testified that as she approached the intersection the light was "yellow" for eastbound traffic. This we take to mean that the signal device was in the process of changing from "Go" to "Stop." She said the mail truck stopped and when it did it was headed toward the east and that the driver of the mail truck gave no signal indicating he was going to make a right turn. Plaintiff applied the brakes on her car and stopped behind the mail truck in the middle lane of the three eastbound lanes. When she applied her brakes she felt no swerving in her car. Just before the application of the brakes she was driving about 20 miles per hour.

When she stopped her car, she looked into her rear vision mirror and could see a car behind her. She said this car was in the same lane she occupied. It appeared to be about two car lengths, maybe one, behind her. She explained that the car she observed in her rear vision mirror was in motion and attempted to pull over into the eastbound lane of traffic to her left, which would be the lane immediately adjacent to the center of the street, and it failed to pull over far enough. This car was being operated by defendant and the car hit the rear tail light of plaintiff's car. In describing the collision she said "It hit hard" and the collision caused her to be "knocked * * * toward the front and that's what made me hit the steering wheel." The only damage to her car was a broken left tail light. She said the right front fender was bent, a front light was

broken and the bumper was bent on defendant's car. When asked to describe the position of defendant's car after the collision, she said the rear of his car was in the middle eastbound lane and the front was "in the other lane."

Defendant testified that as he was driving eastwardly between 20th and 18th Streets, he was in the lane next to the center of Market Street. (Which would be the lane immediately north of the lane in which plaintiff said she and defendant were driving.) He described the eastbound traffic as "light" and westbound traffic as "crowded." There were no cars in front of him in the lane he was using. In the lane to his right and about six car lengths in front of his car he saw a truck of the Railway Express Company and directly behind it was plaintiff's car which he said was two or three car lengths in front of him. He said the traffic light was "green" as he approached 18th Street. He further testified that as he approached 18th Street the Railway Express Company truck was making a right turn to go south on 18th Street and in doing so the truck "slowed up" and plaintiff's car made an "emergency stop." In the course of making the emergency stop plaintiff's car swerved into his lane. In describing the action of plaintiff's car he said, "Well, her rear end come into my lane * * * It skidded." When the rear end of plaintiff's car swerved into his lane, his car struck plaintiff's car.

Defendant further testified that the right front end of his car came in contact with the right rear bumper of plaintiff's car. The grille and "a little bit of the fender" on defendant's car "was dented." He said there was no damage to plaintiff's car. After the collision the right rear of plaintiff's car was in the eastbound lane next to the center of the street and the front end was in the center lane for eastbound traffic. He said there were skid marks on the pavement from the center lane for eastbound traffic to the lane north of it "leading up to the (rear) wheels of her car."

The first contention presented by defendant is that the trial court erred in failing and refusing to give and read to the jury Instruction "C" which was offered by the defendant. This instruction sought to withdraw from the jury's consideration, in the event it found in favor of plaintiff, all the evidence concerning a miscarriage suffered by the plaintiff and all the conditions resulting directly therefrom. There was considerable testimony given by plaintiff and her medical witness that subsequent to the accident plaintiff suffered a miscarriage. This testimony was admissible when it was offered because plaintiff's petition contained an allegation that plaintiff suffered a miscarriage as a result of the collision. Defendant now contends that Instruction "C" should have been given for the reason that there was no medical testimony to show that the miscarriage did or could result from the accident and as a result a finding by the jury that plaintiff suffered a miscarriage could only be based on speculation and conjecture. This contention of defendant must be sustained.

At the time of the accident plaintiff had been pregnant approximately three months. Plaintiff testified that when the collision took place she was knocked against the steering wheel. Thereafter, she began, as she said, "feeling real serious pains in my chest and down in my stomach * * *." She said that after she got home she continued to feel sick and further said, "I was having pains in the lower part of my stomach and then I started flowing and I called the doctor." She testified she had a miscarriage, but it is not clear from her testimony when she sustained the miscarriage. She further testified that for quite a long time she was having pains in the lower part of her back, in addition to those she complained of in her stomach, and also said that she suffered painful menstrual periods.

She further said that after the miscarriage, "I began to have a lot of pain in the low part of my back." She suffered with this pain until the February preceding

the time she gave her testimony. Since then the pain does not bother her "quite as much."

Dr. Vaughn C. Payne was offered as a witness by plaintiff and testified in her behalf. On May 6, 1955, he saw plaintiff at her home, following the collision of her automobile with that of defendant. His examination revealed "that she was very painful and sore with spasticity in the lower back muscles—lower abdomen." He testified that plaintiff was pregnant approximately three months and that she had "some vaginal bleeding at this time." He prescribed bed rest, some sedatives and the use of hot water bags to her back. On the occasion of his second visit he found plaintiff in the same condition revealed by his first examination, except that she was experiencing increased pain in her abdomen and back. On the occasion of his third visit he said she was practically the same, adding, "She was still having vaginal bleeding and she was very tender and sore in the lower abdomen and she complained of intense low back pain." He further testified that she "miscarried about four or five days after that." He said that after the miscarriage took place plaintiff's back continued to give her "much trouble" and he continued to treat her for this injury to her back. When asked to describe "what was bothering her (plaintiff) with reference to her back," he said that his examination revealed spasticity in the low back muscles and that she had suffered "a whip lash strain." He said that such an injury puts a strain on the muscles, soft tissue and framework of the back.

In a hypothetical question propounded to Dr. Payne, after stating some of the facts in relation to the accident, he was asked, "she thereafter complains—she is pregnant at the time of this collision—she thereafter complains of pain in the lower part of her back, pain in her abdomen and suffered a miscarriage. Could you, Dr. Payne, within reasonable medical certainty say that the pain *in her back* would have been caused by the patient having been thrown forward and backward in the automobile collision? * * *" At this point an objection was interposed by defendant's counsel. Thereafter, the following facts were added to plaintiff's hypothetical question: "and adding to that question, Doctor, part 2; that, the fact that the damage to the automobile in which your patient—your hypothetical patient was in—there was a broken tail light on the left rear side of her car and on the other party's automobile that there was a broken headlight and a fender smashed. Now, could you within reasonable medical certainty say that by reason of an impact like that *would cause the injury to the patient's back?*" Dr. Payne answered, "Yes, sir."

This was the only question propounded to Dr. Payne that attempted to show the accident as the proximate cause of plaintiff's injuries. No place in the aforestated hypothetical question or elsewhere in the record did plaintiff show by medical evidence that the collision caused plaintiff's miscarriage. We think such a showing was necessary before the jury could consider and award damages for the miscarriage. The only injury connected with the accident in the hypothetical question was the injury to plaintiff's back. The law casts the burden on plaintiff to show by substantial evidence the causal connection between all of the alleged injuries for which plaintiff seeks recovery and the negligence of defendant. Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312; Derschow v. St. Louis Public Service Co., 339 Mo. 63, 95 S.W.2d 1173, and Franklin v. Kansas City Public Service Co., 239 Mo. App. 151, 186 S.W.2d 546.

The fact that miscarriages occur to pregnant women is a matter of common knowledge. Also, it is a known fact that miscarriages occur from many known causes and sometimes occur when no reason for its occurrence is present. In the case of DeDonato v. Wells, 328 Mo. 448, 41 S.W. 2d 184, loc. cit. 187, 82 A.L.R. 1331, the court, when referring to the evidence con-

cerning the alleged retroversion of plaintiff's womb and her miscarriage, said:

"The evidence of these same expert witnesses showed that retroversion of the womb and miscarriage were by no means confined to traumatic causes, but resulted from many causes, and was common among women without any known or discoverable cause."

The court in the DeDonato case, when commenting on the need of expert medical evidence to show the causal connection between plaintiff's alleged retroversion of the womb and her miscarriage, further said at loc. cit. 187:

"The chief value of expert evidence lies in the fact that the witness possesses superior knowledge of the subject under consideration, and by reason of his study, training, and experience he is able to discern and trace the causal connection, if any, between successive events, and can aid the jury in determining whether the claimed injury is the result of the alleged cause or may have a different cause."

In Derschow v. St. Louis Public Service Co., supra, respondent began to bleed from the vagina immediately after she fell, while alighting from one of appellant's streetcars. Subsequently, a surgical operation was performed to find out what was causing the bleeding. The operation disclosed that both ovaries of plaintiff were prolapsed in the cul-de-sac. In the course of discussing the principal issue, as to whether the evidence was sufficient to permit the jury to find that respondent had sustained permanent injuries, the court said:

"While, in the instant case, the bleeding immediately following the fall justifies an inference by a layman that it resulted from the fall * * *, the record fails to disclose that the physician was aware of the prolapsed condition of the ovaries or any condition of the appendix justifying its removal until the operation. Under these cir-

cumstances, any inference by a layman that the prolapsed condition of the ovaries resulted from the fall would be mere guess, conjecture, or speculation, * * *." 95 S.W.2d loc. cit. 1175.

■ In the case before us we do not have a situation where the miscarriage occurred at the time of the collision or immediately following it. It is not clear in the record when the miscarriage happened, except that a number of days elapsed, perhaps a week, after the accident before it occurred. Under the circumstances of the instant case no layman could know or have any reasonable basis for an inference that the miscarriage resulted from the collision and not from any other cause. There was no substantial evidence in the instant case tending to exclude all other causes save the collision. There was nothing to show that the collision was the cause of plaintiff's miscarriage. Kimmie v. Terminal R. R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561.

We think the question of whether or not the miscarriage sustained by plaintiff was the result of the collision is for the medical expert to answer. Franklin v. Kansas City Public Service Co., 239 Mo.App. 151, 186 S.W.2d 546. If, as said by the medical witnesses in DeDonato v. Wells, supra, a miscarriage may result from many causes and was common among women without any known or discoverable cause, then any damages allowed by the jury in the instant case for miscarriage would be based on mere conjecture and speculation and would not be based on substantial evidence showing that the miscarriage was caused by the collision.

■ The cause of the miscarriage under the circumstances present in this case is not within the sphere of common knowledge. For a jury to be able to reasonably find that the miscarriage was caused by the collision, the testimony of a witness or witnesses possessing special knowledge and skill in the science of medicine is required under the circumstances. As we have stat-

ed, we think that the question of whether the miscarriage was caused by the collision is a medical question requiring the testimony of men skilled in that profession. Sickmund v. Connecticut Co., 122 Conn. 375, 189 A. 876.

Plaintiff's instruction concerning damages, given by the court, was general in character and permitted the jury to consider all injuries shown by the evidence. There was no language in that instruction withdrawing from the jury's consideration the evidence bearing on plaintiff's miscarriage and the conditions resulting therefrom. As we have pointed out there was a considerable amount of evidence concerning the occurrence of plaintiff's miscarriage. The amount of the verdict in this case indicates the jury considered injuries other than those to the low back region of plaintiff.

Instruction "C" offered by defendant and refused by the court instructs the jury that it was not to allow plaintiff anything "by way of damages for said miscarriage or the conditions resulting directly therefrom." We have shown heretofore that there was no substantial evidence of causal connection between the collision and plaintiff's miscarriage, and for this reason Instruction "C" should have been given by the court. Therefore, the court's refusal to give said instruction was prejudicial error. Franklin v. Kansas City Public Service Co., supra.

■ Plaintiff's Instruction No. 7, concerning the damages that may be awarded plaintiff, instructed the jury that, among other things, it may take into consideration "The nature, extent and permanent character" of such injuries it may find from the evidence plaintiff sustained on the occasion of the collision. Defendant insists that it was error for the trial court to submit the issue of permanent injuries to the jury for the reason that there was no evidence to support such a submission.

Dr. Payne, after describing the injuries he found in his examination and treatment of plaintiff, was then asked the following questions to which he gave the answers that follow:

"Q. Dr. Payne, having followed the pain in Mrs. Gulley's back since the time of this collision, could you, within a reasonable medical certainty, state whether or not she was going to have this pain in the future? A. Yes, sir.

"Q. You say that she will have this pain in the future? A. Yes, sir.

"Q. Do you think, in your opinion as an expert, this pain will remain severe or can you qualify as to how it will affect her? A. Well, she has had it now since 1955, and it is still present. Therefore, it is my opinion that it may get better and it may get worse and it may remain the same; but it is my opinion that she will have pain in her back in the future."

The above was the only evidence in the record concerning the prognosis of plaintiff's condition. This testimony of Dr. Payne is merely an opinion that the plaintiff will have pain in her back in the future. The opinion of the doctor does not state that the pain will be permanent, that is, that the pain will be with her for the rest of her life. We think the contention of defendant must be sustained and a sufficient statement of our reason can be found in what we said in Heibel v. Robison, Mo.App., 316 S.W.2d 238, loc. cit. 241, wherein we quoted from Weiner v. St. Louis Public Service Co., Mo., 87 S.W.2d 191, loc. cit. 192, as follows:

" ' "To justify a recovery for apprehended future consequences, there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury. To say of a thing it is permanent means that it will continue regardless of a contingency or fortuitous circumstance." Lebrecht v. United Rys. Co. of St. Louis, Mo.Sup.,

237 S.W. 112, 114. Proof of a condition which may cause future trouble is not necessarily proof of a permanent injury, the former may persist after the trial but not continue to exist permanently while the latter is a physical or mental impairment or disability which will last throughout life, and there is a distinction between damages which may reasonably result in the future and damages allowable as for a permanent injury. Bante v. Wells (Mo.App.) 34 S.W.2d 980; Stahlberg v. Brandes (Mo.App.) 299 S.W. 836; Colby v. Thompson (Mo.App.) 207 S.W. 73. To recover damages for permanent injury the permanency of the injury must be shown with reasonable certainty and while absolute certainty is not required mere conjecture or likelihood, or even a probability, of such injury will not sustain the allowance of damages therefor.' Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328, loc. cit. 334."

Plaintiff failed to show with reasonable certainty that her injuries will be permanent. For this reason the trial court erred in telling the jury that it may consider the permanent character of plaintiff's injuries.

 Defendant urges us to reverse the judgment of the court and to remand the case for a new trial on all issues, contending that the errors of the trial court reviewed by us affected the jury's consideration on the question of liability. We do not agree. Section 512.160(3) RSMo 1949, 33 V.A.M.S., admonishes us that no new trial shall be ordered as to issues in which no error appears. Defendant has urged no error that affects the issue of liability. Defendant points to the case of Heibel v. Robison, supra, as support for his request. However, in that case one of the points asserted had some bearing on the issue of liability. As we said, no such point has been asserted in this case.

We are unable to tell from an examination of the record before us what the jury may have allowed in its verdict for the miscarriage and the submitted permanency of the injuries. Therefore, we are unable to cure by remittitur the errors we have found concerning the issue of damages. For this reason the judgment of the court should be reversed and the cause remanded for a new trial on the issue of damages alone. It is so ordered.

WOLFE, P. J., and JAMES D. CLEMENS, Special Judge, concur.