GEORGE MARDORF v. DULUTH-SUPERIOR TRANSIT COMPANY.[1]

May 31, 1935.

No. 30,440.

[1]Reported in 261 N. W. 177.

538

See 192 Minn. 230, 255 N. W. 809.

A. L. *Agatin* and *Courtney & Courtney,* for appellant.

G. A. E. *Finlayson,* for respondent.

I. M. Olsen, Justice.

Plaintiff sued to recover damages for personal injury claimed to have been caused by the negligence of the defendant's motorman in operating one of its street cars in Duluth. The court submitted to the jury the question of defendant's negligence and the question of plaintiff's contributory negligence. The jury returned a verdict for plaintiff. Thereafter the defendant moved in the alternative for judgment notwithstanding the verdict, or, if that be denied, then for a new trial. The court, on such motion, ordered judgment in favor of the defendant notwithstanding the verdict. Plaintiff appeals from the order. The court in its memorandum, made a part of the order, expresses doubt as to whether plaintiff had shown negligence on the part of the defendant, but holds that plaintiff was

guilty of contributory negligence as a matter of law and bases the order for judgment on that ground.

The case having been submitted to the jury and a verdict returned finding that defendant was negligent and that plaintiff was not guilty of contributory negligence, the review here is governed by the well-known rule that the evidence is to be viewed in the light most favorable to the party in whose favor the verdict was returned. The further rule is that if from the testimony, the circumstances shown thereby, and the reasonable inferences which could be drawn therefrom the jury could reasonably find as it did, then the verdict must stand; in other words, if there is evidence reasonably sufficient to sustain the verdict, then judgment notwithstanding should not have been ordered. Judgment should not be so ordered for defendant unless it clearly appears from the whole evidence that the cause of action sought to be established does not in point of substance constitute a legal cause of action. It is not sufficient to authorize such an order that the evidence was such that the trial court, in its discretion, ought to have granted a new trial. If there is some evidence reasonably tending to prove a good cause of action, judgment should not be ordered. It should not be ordered unless the evidence is practically conclusive against the verdict. 3 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) pp. 1002-1004, § 5082, and list of cases cited in the notes.

■ The defendant operates lines of street railway in the city of Duluth and vicinity. It runs one such line, known as the Woodland avenue line, out to a section of the city known as Woodland. At the end of the line is a loop upon which outgoing cars turn and then proceed back into the main part of the city. The track is a double track up to the loop and a single track around the loop. The cars operated are one-man cars, and the motorman is stationed at the control mechanism at the front end of the car. Passengers enter the car at the front end, where the motorman is stationed. The loop is about 100 feet wide at its widest part. There is a point at the beginning of the loop where a "Car Stop" sign is placed, where cars stop to let off and receive passengers. After the turn from the main line to this point, the track is comparatively straight.

Beyond the stopping place, the track turns more sharply to the left to get back to the southbound track. On the evening of May 7, 1933, at about 9:30 o'clock, plaintiff and his wife came to the car stop, intending to take a car back into the city. They found a car standing there with the doors closed. According to plaintiff's testimony, he walked along the right side of the car up to the front door on that side and rapped on the glass. He saw the motorman standing in the car at the controls and said the motorman was looking at him. Just as he rapped on the door the car started. It moved ahead a short distance and again stopped. When it so stopped, the doors at the front were thrown open so that passengers might enter. The car had moved so that the rear end thereof was then some 25 or 30 feet ahead of where plaintiff and his wife were standing at the time he rapped on the door. Plaintiff and his wife then started to walk to the standing car to enter the door at the front thereof. The car had then come to the more sharply curving part of the track. Just as plaintiff had reached a point a little in front of the rear of the car and was walking ahead on the ground close to the side of the car, the door closed and the car again started up without any warning, and the rear end of the car, swinging on the curve, struck plaintiff or brushed against him, threw him into a slight depression or ditch alongside the track, and caused the injuries complained of. There was one passenger in the car at the time. She testified that she was sitting in a seat on the right side of the car and was looking out of the window while the car was standing at the "Car Stop" sign; that she saw a man and a woman at the side of the car, and when it started to move she said to the motorman, in substance, that there were a couple of passengers coming, and he then stopped the car in a short distance. She did not notice whether the door was thrown open. The motorman admitted that this passenger informed him there were passengers wanting to get on. The night was dark, and a light rain was falling. There was some wind. There were no lights at the place except those in the car, which shone out through the car windows. The rays of light from the windows did not strike the ground alongside the car where plaintiff was walking because the windows were a considerable distance up

from the ground. The motorman, on cross-examination, testified that when he started the car from the place near the stop sign he was exactly on time, and when he started the car the second time, from the place of the accident, he was 30 seconds late, so that, according to that testimony, he waited less than 30 seconds for the prospective passengers to get on. What else he did and knew at the time is best shown by his own testimony on cross-examination. He testified, in part, as follows:

Q. "And when you have a night of that kind with drizzling rain, you of course appreciate that it is necessary to keep a greater lookout for passengers getting on and off a car than it is on an ordinary night?

A. "Oh, yes.

Q. "You have to be on a keener lookout, don't you?

A. "You have to all the way around. It is harder to see.

Q. "So that, in addition to the rain, you knew, of course, that night that you did not have the use of your mirror?

A. "Yes, I did.

Q. "Normally that mirror is set at an angle outside of your door so that you, from your controls, can look at it and see all the way back on the side of the car?

A. "Yes, you can see, but it depends a good deal on—

Q. "And that mirror is there principally so that you can see whether there is anyone getting on or off of either gate and that no one would be injured by a sudden movement of the car?

A. "Yes.

Q. "It is to prevent accidents, in other words?

A. "Yes.

Q. "You knew, of course, at that time of night that you would not have the use of that mirror, didn't you?

A. "Yes, I knew that.

＊　＊　＊　＊　＊　＊

Q. "And when you did that, when you pulled up in that position, did you move from the position where you were at the controls?

A. "I just stood up and turned around.

542

Q. "What do you mean, get up and turned around?

A. "I stood up and looked along the side of the car.

Q. "That is, stood at the point where you were sitting there at the controls?

A. "Yes.

Q. "In other words, you just got up like that (counsel indicating)?

A. "Yes.

Q. "And looked around?

A. "Yes, sir.

Q. "You did not walk over to the doors?

A. "No, I did not.

Q. "You knew that you did not have the use of the mirror at that time?

A. "Yes.

Q. "And you knew it was a bad night?

A. "I did.

Q. "And you did not walk over to the doors?

A. "No, sir.

Q. "And when you turned around and looked back you could only see about ten feet?

A. "That is all.

Q. "And that car is how long?

A. "Fifty feet.

Q. "So there was 40 feet of the side of that car that you could not see from that position?

A. "Yes.

*    *    *    *    *    *

Q. "Well, you knew that there was considerable turn in that loop at that point?

A. "There is some turn there.

Q. "There is practically no turn where the car first stopped?

A. "No.

Q. "That is almost a straight rail, isn't it?

A. "Where it stops first, yes.

Q. "Yes, and where you pulled up some 25 feet, then it takes quite a sharp angle?

A. "Takes a little.

\* \* \* \* \* \*

Q. "And you knew by starting up that car, turning on the power, and moving forward that there would be a swing at the back end of that car, didn't you?

A. "Yes, certainly.

Q. "A swing of about how many feet?

A. "About a foot and a half.

Q. "A foot and a half?

A. "Yes, just about.

Q. "Isn't it closer to three feet there, Mr. Olson?

A. "Swing?

Q. "Yes.

A. "No, it is about three and a half feet from the rail.

Q. "Yes.

A. "You know, the car overhangs pretty near two feet.

Q. "So that you would have a swing of about three and a half feet from the nearest rail as you turned—

A. "Yes.

Q. "—the power on and started to move from that second position?

A. "Couldn't have three and a half feet because the overhang of the car is almost two feet.

Q. "No, I mean that you would have a space of about three and a half feet from the rail to the outermost portion of the car as it turned that circle, on that circle?

A. "Yes, that would be about three and a half feet from the rail.

\* \* \* \* \* \*

Q. "When you looked in your mirror while you were starting the car from that second position, what you wanted to know was whether or not you could move that car without hurting anybody?

A. "Yes.

Q. "Yes.. And you couldn't see through the mirror?

A. "No.

\* \* \* \* \* \*

Q. "All right. You testified in federal court when this matter was up there?

A. "Yes, I did.

Q. "That was about the 11th of December, 1933?

A. "Yes.

Q. "Were you asked this question, Mr. Olson, and gave this answer, referring to the time that you had pulled up 20 or 25 feet and stopped?

A. "Yes, sir.

Q. " 'You were expecting somebody to get on?' And you answered 'Yes.' That was your testimony?

A. "Yes.

＊　＊　＊　＊　＊　＊

Q. "So it is up to the motorman to stay as long as necessary to pick up passengers at car-end points?

A. "Yes, sir.

Q. "And that is why you said in your testimony that you could wait a week if you wanted to?

A. "Yes."

It is clear that the motorman was informed and knew that there were passengers seeking to get on. The darkness, weather condition, and situation were such as to call for care on his part. His duty was to exercise care to see that the prospective passengers had time and opportunity safely to reach and enter the door of the street car. The question of the negligence of the motorman was a question of fact for the jury.

■ Contributory negligence was also a question of fact for the jury. In addition to what has already been said as to the testimony and the situation in which plaintiff and his wife found themselves, which need not here be repeated, it may be noted that they were walking alongside the track and the car on the wet ground, not on any sidewalk or pavement. They were not young. Plaintiff was 65 years of age. The ground was fairly smooth part of the way, but, according to plaintiff's testimony, it was rough at the place of the accident. They took the nearest and most accessible course

to reach the entrance door of the car. It cannot well be said that plaintiff was guilty of contributory negligence as a matter of law. It was error to order judgment on the ground of contributory negligence.

The wife was a witness for plaintiff and corroborated his testimony to some extent. She was somewhat confused in her testimony as to whether questions asked referred to the car while standing at and starting from the stop sign or when the second stop and start were made.

There is seeming conflict in the evidence as to how far the car moved after it first started until it again stopped. Plaintiff's testimony is clear that it moved so that the rear end of the car was 25 or 30 feet ahead of where the plaintiff was standing at the front door of the car when it started. His wife, the one passenger, and the motorman estimated that the car moved about 25 or 30 feet. The length of the car is 50 feet. It is not very important either way, but it is probable that most persons would say that the street car moved ahead 25 feet, if while standing at the front end of the car, they saw it move ahead so that the rear end of the car was 25 feet ahead of where they stood.

Plaintiff's counsel present the claim that the court should have instructed the jury that the care required of the defendant was the high degree of care required of a carrier of passengers for hire, a greater care than ordinary care. The court instructed the jury that the defendant owed the plaintiff the duty to exercise ordinary care and that plaintiff was not a passenger. Plaintiff having received the verdict and the order for judgment being based on contributory negligence, the question of the degree of care owing by the defendant to the plaintiff is not directly involved on this appeal.

The trial judge apparently having been in doubt as to the sufficiency of the evidence to show negligence on the part of the motorman and having neither in the order made nor otherwise passed upon defendant's motion for a new trial, that motion should now be passed upon.

The order appealed from is reversed, without prejudice to the consideration and decision by the trial court of the motion for a new trial.

Order reversed.

