GEORGE EWING, A MINOR, BY LUCILLE EWING, AS
MOTHER AND NATURAL GUARDIAN, v. GEORGE
BENZ & SONS AND ANOTHER.[1]

August 15, 1947.

No. 34,415.

---

[1]Reported in 28 N. W. (2d) 733.

*Arthur T. Nelson* and *Walfrid H. Peterson,* for appellant.

*Freeman & King* and *Robert L. Hoppe,* for respondent George Benz & Sons.

*Abbott J. Gould* and *Irvin E. Schermer,* for respondent Charles T. Enright.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from an order denying plaintiff's motion for a new trial. Plaintiff moved this court at the time of the hearing of oral arguments to change the title as above, which motion was granted.

On October 5, 1942, at about 12:30 p. m., plaintiff, George Ewing, then three years of age, was on the roof of the three-story building located at 23-25 East Hennepin avenue, Minneapolis, with his mother, Lucille Ewing. She had taken him with her to the roof, where she was hanging the family washing on a clothesline which had been erected there. While his mother was so engaged, George fell through a skylight on the roof of the building and dropped 30 or 35 feet down an opening or shaft to the second floor, receiving injuries. At that time, defendant George Benz & Sons (hereinafter referred to as Benz) owned the building. The ground floor was occupied by two business establishments, and the second and third floors were being used as the Atlas Hotel. Defendant Charles T. Enright was operating the hotel. Enright had a lease of the second and third floors from Benz which expired April 30, 1942. Upon the expiration of that lease, Enright remained in possession of the premises and continued to operate the hotel. On June 5, 1942, Benz leased the second and third floors to one Tony Toll, but admitted that they accepted Enright "as a sublandlord" (subtenant) of Toll. Mrs. Ewing and her husband rented a three-room apartment on the third floor of the building from Enright and moved in sometime in June 1942 with three children, one of whom was George, the child involved in this proceeding. This action was brought to recover damages for injuries sustained by George. The court directed a verdict for defendants.

Plaintiff assigns as error (1) that the court erred in directing a verdict in favor of Benz and in refusing to grant plaintiff a new trial; and (2) that the court erred in directing a verdict in favor of Enright and in refusing to grant plaintiff a new trial. We shall consider these assignments of error in the order named.

■ The first question for consideration is whether the owner of the building is liable under the circumstances for the injuries sustained by George. Plaintiff claims that the following authorities are controlling and decisive of the issues raised on the appeal: Restatement, Torts, § 339; Weber v. St. Anthony Falls W. P. Co. 214 Minn. 1, 7 N. W. (2d) 339; Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 261 N. W. 194; Henry v. Haussling, 114 N. J. L. 222, 176 A. 564. Plaintiff relies particularly on Restatement, Torts, § 339, which reads as follows:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to.trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

Referring briefly to the cases cited by plaintiff, the Weber case involved injury to an eight-year-old boy, who at the time of the accident was trespassing on the land of defendant. This court, in holding for plaintiff, adopted the principles set forth in Restatement, Torts, § 339, *supra,* and said in part (214 Minn. 5, 7 N. W. [2d] 342):

"* * * It is enough that the possessor knows or should know that children are likely to trespass on his land and that they will be exposed, if they do trespass, to risk of harm by maintenance of the condition."

In that case, the accident occurred on Hennepin Island in the Mississippi River, occupied and used by defendant in connection with the maintenance and repair of its water-power development at St. Anthony Falls. The court said that the evidence amply supported the findings that during the year 1939, when the accident occurred, and prior thereto, the island was frequented to defendant's knowledge by boys from 8 to 16 years old, and that defendant knew the island was a dangerous place for boys to be spending their time. While the defendant there, apparently realizing the possible danger, installed a steel gate and put up "Private Property, No Trespassing" and "Danger, Keep Out" signs, it was held that, while the gate, if closed, was adequate to keep out boys, it was not always kept closed. The boy in question gained entrance to the premises on the day of the accident and was injured while ascending a pile of lumber. This court said that defendant's liability under the rules stated was a fact question for the jury. It further said that it was enough that the possessor knew or should know that children are likely to trespass on the land and would be exposed, if they did trespass, to risk of harm by maintenance of the condition. This court further said (214 Minn. 5, 7 N. W. [2d] 342):

"* * * In Restatement, Torts, § 339, comment on clause (a), it is said:

"'(a) It is not necessary * * * that the child's trespasses shall be due to the attractiveness of the condition. It is sufficient * * * that the possessor knows or should know that children are likely to trespass upon a part of the land upon which he maintains a condition which is likely to be dangerous to them because of their childish propensities to intermeddle or otherwise. Therefore, the possessor is subject to liability to children who after entering the land are attracted into dangerous intermeddling by such a condition main-

tained by him although they were ignorant of its existence until after they had entered the land, if he knows or should know that the place is one upon which children are likely to trespass and that the condition is one with which they are likely to meddle.' "

The principles applicable in the Weber case were also stated and clarified previously in Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 261 N. W. 194, *supra,* where this court held in accordance with the four principles quoted above in Restatement, Torts, § 339.

In the Gimmestad case, we have another situation where a five-year-old child was injured while climbing on piles of lumber stored on defendant's premises. It was held in that case that one who maintains on his premises, without adequate safeguards, dangerous instrumentalities attractive to young children is bound to exercise reasonable care to protect the children from injury. Quoting therein from Best v. District of Columbia, 291 U. S. 411, 419, 54 S. Ct. 487, 490, 78 L. ed. 882, 887, this court stated (194 Minn. 534, 261 N. W. 195) : "The question is one of negligence,—whether particular circumstances gave rise to a duty which had not been performed." It was determined that if one knowingly maintains, unguarded, something that is certain to attract children the legal effect thereof may justify a finding of actionable negligence. On the question of invitation, this court said (194 Minn. 537, 261 N. W. 196) :

"We conclude that the idea of invitation, express or implied, actual or factual, as condition precedent to liability in the case of young children injured as was the plaintiff here, should be finally and emphatically discarded. They are trespassers, but, because of their tender years and the consequent lack of perception and responsibility, liability results notwithstanding the trespass."

Henry v. Haussling, 114 N. J. L. 222, 176 A. 564, *supra,* has some similarity in facts to the instant case. There, the parents of a young child rented certain rooms on the second floor of a building in Newark. At the time, the agent for the landlord said that there was no back yard in which to hang clothes, but only a roof, and that the clothes could be hung out and the children allowed on the roof, but

that they should not be allowed to make nail holes. The child's mother testified that she noticed that the skylights were in bad order and called attention to it. The child was sent by her mother to bring in the clothespins and fell through the skylight, which, according to the testimony (114 N. J. L. 223, 176 A. 565), "was rotten around the ends and could be lifted up." There was evidence that the roof was used in common by tenants and was in bad order with rotten skylights. The court said (114 N. J. L. 224, 176 A. 566):

"* * * if the skylights were something with which tenants might come in contact incidentally while hanging out clothes, and rotten enough to let them through the roof with comparatively insignificant pressure, it would seem that negligence would be inferable."

The Henry case differs from the case at bar, in that it appears from the testimony in the Henry case that at the time the premises were rented the parents were told that children would be allowed on the roof, and it further appears that the owner had notice of the rotten condition of the skylight. Cited in the Henry case was another New Jersey decision, Saunders v. Eastern Hydraulic P. B. Co. 63 N. J. L. 554, 44 A. 630, 76 A. S. R. 222, where plaintiff, in replacing a pane of glass in a skylight, put his hand on the center piece and leaned on it so heavily as to break it. The court held in the Saunders case that it was (63 N. J. L. 556, 44 A. 631, 76 A. S. R. 222) "impossible to discover any ground in reason for imposing upon the master any duty to have it so constructed as to bear the weight or any part of the weight of a servant, although engaged in repairing it."

In the instant case, one Alfred J. Carlin, who did maintenance and repair work on buildings owned by Benz, testified that he went to the scene of the accident five days after it happened and put in a new pane of glass where the one was broken when the boy fell through the skylight, and that there was no break in the rim or frame. He said that the frame in which the pane of glass sets was made of galvanized iron, and that this was the only time he had replaced any skylight glass in the building. E. R. T. Peterson, a civil engineer, testified that he examined the skylight at the time of the

trial in October 1946 and that it was "a regular pressed steel sky-light frame" and that he found no breaks in the frame and no places where it was defective. Jacob L. Brown, another maintenance man for Benz, said that some time before the accident he examined the skylight with Mr. Carlin and found a leak where it connected with the penthouse, which they repaired. While there was conflict in the testimony about a break or crack in the glass, the testimony was that the frame holding the skylight was made of steel and was in good condition. There is no testimony that the owner or his agents ever authorized George or his parents to use the roof of the build-ing as a playground for children. Nor was there any evidence of notice to the owner that children ever went on the roof of the build-ing. An examination of the testimony and exhibits with reference to the roof of the building would indicate that, while the owner was acquainted with the fact that a clothesline was placed on the roof of the building for the convenience of the tenants, the owner would hardly have anticipated that the roof would become a play-ground for children, and we doubt whether Benz or any other owner would have ever authorized such a thing, because of the nature of its construction. There were five or six skylights on the roof. Three sides of the roof had small rails or walls low enough so that even a three-year-old child could climb them, but on the remaining side there was no wall or rail, and a child could walk right off the roof because of the lack of any obstruction whatsoever. Surely, no sensible or practical owner of a building would authorize such a place as a playground for children.

It appears clear from the evidence that Benz had no notice that any children went on the roof. The skylight was apparently neces-sary from an architectural standpoint to aid in lighting of the build-ing. Under the circumstances of this case, the owner cannot be charged with maintaining a structure or other artificial condition on the premises, where it can be said that the owner knew or should have known that children were likely to trespass. We cannot see where this case comes within the rules or the cases cited above by plaintiff as controlling as to the owner of a building. Rather, it ap-

pears to come within the scope of Kayser v. Lindell, 73 Minn. 123, 75 N. W. 1038. In that case, defendant was the owner of two houses on the same lot. He lived in one of the houses and his tenants occupied the other. Between the two houses was an open place on which the children of his tenants played. In the rear of this space was a retaining wall 7½ feet high. The 3½-year-old child of plaintiff, one of defendant's tenants, climbed upon this wall while playing, fell off, and was injured. A verdict was returned for plaintiff, a new trial denied, and defendant appealed. This court reversed the trial court, and said (73 Minn. 125, 75 N. W. 1039) :

"But, conceding that this yard was not a part or appurtenance of the rented premises, and that the child was in the yard by the implied invitation of defendant, we are still of the opinion that plaintiff is not entitled to recover. The doctrine of the 'turntable cases' cannot be extended to such a case as this. See Stendal v. Boyd, * * * 67 Minn. 279, 69 N. W. 899; Haesley v. Winona & St. P. R. Co., 46 Minn. 233, 48 N. W. 1023 [24 A. S. R. 220].

"It is true that, if the owner of premises keeps upon them a concealed trap, and a person coming upon the premises by invitation is injured thereby, he may recover. But there was no mantrap in this case. The wall was plain to be seen. The child knew it was there, and fell off of it in the daytime. While the owner of premises may owe more duty to a child than to an adult coming upon his premises by implied invitation, yet he is not bound to guard every stairway, cellarway, retaining wall, shed, tree and open window on his premises, so that a child cannot climb to a precipitous place and fall off."

And in Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 109, 205 N. W. 889, 890, 45 A. L. R. 973, quoting from the language of Mr. Justice Mitchell in Twist v. W. & St. P. R. Co. 39 Minn. 164, 167, 39 N. W. 402, 404, 12 A. S. R. 626, it was said:

"* * * To the irrepressible spirit of curiosity and intermeddling of the average boy there is no limit to the objects which can be made attractive playthings. In the exercise of his youthful ingenuity, he can make a plaything out of almost anything, and then so use it as

to expose himself to danger. If all this is to be charged to natural childish instincts, and the owners of property are to be required to anticipate and guard against it, the result would be that it would be unsafe for a man to own property, and the duty of the protection of children would be charged upon every member of the community except the parents or the children themselves."

In Schmit v. Village of Cold Spring, 216 Minn. 465, 467, 13 N. W. (2d) 382, 384, 154 A. L. R. 1325, it was stated:

"* * * This court no longer recognizes a distinction between 'attractive nuisance' cases and other negligence cases, but does recognize the diligence required when attractive or alluring instrumentalities are placed where children are known habitually to play."

In the instant case, we have seriously considered the question whether the skylight could in any manner be construed as constituting such an attractive or alluring instrumentality placed where children were known habitually to play as to require extra diligence on the part of the owner, but we conclude that the facts do not bring the case within that rule.

While this case is unfortunate and touches a sympathetic chord, as do all cases pertaining to injuries to children, we cannot see how under the circumstances Benz as owner of the premises should be held liable. We conclude that the trial court did not err in directing a verdict for and refusing to grant plaintiff a new trial as to Benz.

■ Our next question is whether the court erred in directing a verdict for and refusing to grant plaintiff a new trial as to defendant Charles T. Enright, conceded by the owner to have been accepted by the owner as the sublandlord of Tony Toll.

The Ewings rented the rooms from Enright's caretaker and moved in about June 1942. Wellington Ewing, husband of George's mother at the time of the accident, was divorced from her at the time of the trial. He was not George's father. There was some reference at the trial to ill feeling between Ewing and his former wife, Lucille. He testified in part as follows:

"Q. Were you the one who rented the rooms in this hotel?

"A.   Yes.

\* \* \* \* \*

"Q.   Who did you have a conversation with about renting the place?

"A.   The caretaker, I believe, mentioned that children were not allowed on the roof of the building.

\* \* \* \* \*

"Q.   And he specifically told you that children were not allowed on the roof?

"A.   Yes.

"Q.   Did he tell your wife that too?

"A.   I believe he did.

"Q.   We understand it is a case where even though those instructions were given you, you and your wife permitted the boy to be up there?

"A.   I was at work and I didn't have much to do with it, but the boy was allowed in some very dangerous places, to my judgment.

"By the Court:   Did you ever see him up there?

"A.   Yes.

\* \* \* \* \*

"Q.   You say the boy was permitted to be in very dangerous places, in your judgment?

"A.   That's right."

He said the door leading to the roof was unlocked, that he had seen George on the roof, and that he did not think he ever took him down.

"Q.   But you were willing that he be up on this roof, and you didn't take him down?

"A.   As a workingman, I had very little to do with his care.

"Q.   I know, but you said you saw him up there and you didn't take him down?

"A.   She was at home at the time.

"Q.   You were able to be about, weren't you, you could have walked up there?

"A.   I could have, yes."

He said he noticed that one of the panes of glass in the skylight was cracked before the accident.

"Q. We have had some testimony here that there was a great big hole in one of those windows. Did you ever notice a hole in one of the windows?

"A. Only a crack."

George's mother testified that when she rented the rooms Enright's caretaker, a Mr. William Shinse, told her that it was all right for her to hang the family washing on the line erected for that purpose on the roof; that the other women living there also hung their washing on the roof, as there was no other place provided. On the day of the accident she was hanging out the washing and had George with her. "I took him [George] up there because he always carried the baby around, and I was afraid that he might drop the little girl." She said there were cracks in some of the skylights when they moved in and that they were still there at the time of the accident.

"Q. Just what happened then, you were hanging up clothes and your son was with you, and then tell us just what happened.

"A. Well, I was hanging clothes up and I happened to turn my back to hang some clothes up and I suppose he spied that glass.

\* \* \* \* \*

[Objection to anything she supposes.]

"Q. Just tell what he did, Mrs. Ewing.

"A. Well, he looked through a hole. The glass was entirely out, a corner of the skylight, and he lost his balance and went down.

"Q. Did he break the glass as he fell through?

"A. Yes, he did.

"Q. There was an open hole in the glass in one corner?

"A. Yes, sir, there was.

"Q. Is this the skylight where he fell down right in front of this hatchway?

"A. Yes, that skylight there."

There is some inconsistency in Mrs. Ewing's testimony, as she said that while she had her back turned to the child he looked through

a hole where the glass was entirely out of a corner of the skylight, lost his balance, and fell. How she could determine this with her back turned would be speculative, as later she testified that she did not know whether the child walked or ran over to the skylight, but supposed "as a child he would run over there." There is no evidence as to just how the accident occurred. It appears from the exhibits and testimony that the glass used in the skylight was approximately one-fourth of an inch thick and was not reinforced by wire of any kind. Mrs. Ewing also testified that the hole in the skylight through which she claimed George looked before he fell was about "as big as the child's head," six or seven inches in size; that she noticed it the first day she hung up the clothes in June prior to the accident, but that she never told either Enright or his caretaker about it. "I told my husband, and I thought he might tell him." Although she admitted that this hole in the skylight was directly above the desk in the lobby on the second floor of the building and although she lived in the place from June until the time of the accident in October, she testified that she never saw any water around the inside of the stairway or in the location of the desk on the second-floor lobby. When asked, "Had it rained at any time while you were there?" she answered, "I suppose it had, but I cannot remember it." It would appear inconsistent that a hole in the skylight six or seven inches in diameter would remain unrepaired for a period of about four months without evidence of water coming in on the stairway and around the desk directly below, especially during that season of the year. Mrs. Ewing also testified that she had taken George to the roof each time she hung up the washing, which was three times a week from June to October.

"Q. Knowing that hole was there, you realized it was dangerous to bring your children up there?

"A. Yes.

\* \* \* \* \*

"Q. Who ever saw you with any of your children up there as far as you know?

"A. I don't know of anybody that I could say right offhand.

"Q. Do you recall of a single person ever being up there when you had your children there?

"A. Well, no, nobody was up there.

"Q. Was Mr. Enright ever present when you had your children up there?

"A. No, sir, he never was.

"Q. Was Mr. Shinse ever present?

"A. No.

"Q. Was anybody connected with the Benz company ever around when you had your children up there?

"A. Well, I don't know any Benz or anything like that.

"Q. Well, you never remember seeing anybody you didn't know up there when you had your children up there?

"A. No.

"Q. When you talked to Mr. Shinse there was nothing said about permitting your children to play up there?

"A. The only thing was that that was the only place to hang clothes, and he said a lot of times children go up there and play, and that is the reason why I thought it was all right."

Mr. Carlin and Mr. Brown, maintenance men for Benz, both testified that they never saw any children on the roof. Mrs. Ewing claimed that she thought the place was safe, because the caretaker said it was safe, but admitted on cross-examination that the back end of the building did not even have a railing.

"Q. There wasn't a single thing to prevent a child from falling off the roof?

"A. No.

"Q. The railing on the other side was low enough so that even a three-year-old could have climbed it?

"A. They could have, yes.

"Q. Yet you thought it was a place for children to play?

"A. I never thought it, but that is the only place they did have."

While she claimed that George was never up there without her, she testified that she saw another boy who lived in the building on the

roof. She did not know the other boy's age, but she said he was in the first grade.

Defendant Enright testified that he was never on the roof except the day of the accident, and that he never made any repairs to the building during the time he was running the hotel, as Benz did the repairing. He testified that he had never orally or by written document agreed to make any repairs to the building, nor did he ever assume to do so by making any repairs. He also said that he never saw any children on the roof and never reported to Benz the presence of any children up there. He testified that the skylight through which George fell was directly over the desk in the lobby of the hotel; that he was at this desk about once a week; and, while he never looked up at the skylight, that he never saw any broken glass or cracked glass overhead and never saw any water leaking on his desk from the skylight. He further said that he never reported to Benz any trouble or lack of repair with reference to the skylight in question. It would appear from his testimony that Enright was not responsible for the condition or repair of the roof and never authorized the Ewings to permit George to go up on the roof. The only testimony that might be considered as binding upon Enright is that of Mrs. Ewing as to conversations she claims to have had with William Shinse, Enright's caretaker (admitted without objection, although Shinse was deceased). She claims that the caretaker told her that it was the only place to hang clothes and that "a lot of times children go up there and play." While she admitted that it was a dangerous place to take children and that she knew that one end of the roof was unguarded, she indicated that she thought it was a safe place because Shinse said it was safe.

We recognize the rule that the negligence of a parent cannot be imputed to the child.

"* * * after full consideration, this court has determined that negligence of a parent is not imputable to his child and will not bar the child from recovering for injuries sustained through the negligence of a third party." (Citing cases.) Brennan v. M. D. & W. Ry. Co. 130 Minn. 314, 316, 153 N. W. 611, 612, L. R. A. 1915F, 11.

See, also, Forseth v. Duluth-Superior Transit Co. 202 Minn. 447, 278 N. W. 904.

There is no testimony in the instant case which connects the crack or hole in the skylight pane, if one existed, with the cause of the fall or injury to George. If there was such a crack or hole, it was apparently unknown to Enright. The skylights on the roof were a part of the building. They were not located at a place in this case where children would reasonably be expected to go.

We conclude, therefore, that the trial court did not err in directing a verdict for defendant Enright and in refusing to grant plaintiff a new trial as to him.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER and MR. JUSTICE MATSON took no part in the consideration or decision of this case.

---

[1]Reported in 28 N. W. (2d) 740.