## NOLLEY v. CHICAGO, M., ST. P. & P R. CO.
### No. 13982.

United States Court of Appeals
Eighth Circuit.
Aug. 8, 1950.

Irving H. Green, Minneapolis, Minn., for appellant.

C. O. Newcomb, Minneapolis, Minn. (A. C. Erdall and S. W. Rider, Jr., Minneapolis, Minn., were with him on the brief), for appellee.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

A nine year old boy undertook to "hop" a moving freight train in the yards of the Milwaukee Railroad at Minneapolis, and in the incidents which occurred he lost a leg.

In a suit against the Railroad under Minnesota law for negligence, he alleged (1) that the yards constituted an attractive structure or condition, with unreasonable hazards to children, against the dangers of which the Railroad had failed to exercise proper care to protect him; and (2) that the defendant further had been negligent in having proceeded to move the train "with greater speed," thus "causing the plaintiff to be thrown therefrom." On the trial he abandoned the theory that his injury was occasioned by an increase in the speed of the train and shifted to the opposite theory that he had been hurt because the train had been brought too quickly to a stop, through an emergency application of its brakes, so that he was jerked off the car.

The trial court directed a verdict for the defendant at the close of all the evidence, and the plaintiff has appealed.

■ On plaintiff's first theory of liability, Minnesota has adopted the rule of Restatement, Torts, § 339, that "A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

This has been the rule in Minnesota since 1935. See Gimmestad v. Rose Bros. Co., 194 Minn. 531, 261 N.W. 194; Middaugh v. Waseca Canning Co., 203 Minn. 456, 281 N.W. 818, 819; Weber v. St. Anthony Falls Water Power Co., 214 Minn. 1, 7 N.W.2d 339, 341; Schmit v. Village of Cold Spring, 216 Minn. 465, 13 N.W.2d 382, 384, 154 A.L.R. 1325; Ewing v. George Benz & Sons, 224 Minn. 508, 28 N.W.2d 733, 735; Heitman v. Lake City, 225 Minn. 117, 30 N.W.2d 18, 23.

There was evidence in the present case tending to establish the conditions of clauses (a) and (b) of the rule, sufficient perhaps to have entitled those questions to go to the jury as elements of plaintiff's first theory of liability. But we are not able to say that the evidence intended to establish the condition of clause (c) was such that the court under Minnesota law was required to have left this element also to the jury and so had no right to direct a verdict on the basis of it.

The comment in the Restatement on § 339 makes this explanation of clause (c): "The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved therein but none the less chooses to encounter it out of recklessness or bravado."

In the ordinary situation, the question of whether an injured child understood or appreciated the danger of death or serious bodily injury from the attractive structure or condition involved will probably generally be for the jury. But the Minnesota Supreme Court has declared in a number of such cases that the facts of the particular situation left no room reasonably to contend that the injured child did not appreciate the dangers of the condition to which he had exposed himself.

Thus, in Mehalek v. Minneapolis, S. P. & S. S. M. Ry. Co., 105 Minn. 128, 117 N.W. 250, 251, the court said: "According to the undisputed evidence, appellant's son was a nine year old schoolboy, of more than ordinary intelligence, lived only a block from the Twenty-fifth avenue crossing, and his

only object in going on the crossing was for the purpose and with the intention of catching on the train and getting a ride. He and other boys had persistently followed this course for three or four years. It is idle to say that he did not know it was dangerous to attempt to ride on the train, or that he did not know it was wrong to do so. Although he testified to that effect, his very conduct in the manner of crossing the tracks and getting on the train indicates that he knew he had no right to do so."

Similarly, in Powers v. Chicago, M. & St. P. Ry. Co., 57 Minn. 332, 59 N.W. 307, 308, the court took the view that it was "beyond question" that the negligence of the child himself was the immediate cause of his death and said: "The plaintiff's son, (was) a bright, intelligent boy, over 13 years of age, accustomed to be about the station, and familiar with the moving of trains * * *. That, in getting on and off and standing on the step while the train was in rapid motion, he was doing perilous things, putting himself in a position of great danger, must be apparent to anyone who has seen railroad trains moving, and must have been as well known to a boy of his age, intelligence, and experience, especially one who had been, as he had been, warned by his father not to get on and off trains when in motion, as to any one." See also Twist v. Winona & St. P. R. Co., 39 Minn. 164, 39 N.W. 402, 405, 406, 12 Am.St.Rep. 626.

In the present case, plaintiff's testimony and manner of handling himself on the stand (he was still nine years old at the time of the trial) revealed him as a bright, alert and intelligent boy familiar with the yards involved and with all the activities conducted in it. For six years he had been living only half a block from the tracks at his grandmother's house. He attended a public school located approximately the same distance from the yards, where he was in the fourth grade. He had frequently been given the responsibility of taking his younger brother and sister through the metropolitan traffic and on street cars to another part of the city to visit his mother.

The Milwaukee yards consisted of a 113-foot right of way, extending for 3 miles in an easterly-westerly direction, depressed some 20 feet below street level, and with 37 street bridges or viaducts crossing over it. An ordinance of the City of Minneapolis enacted many years before had required the Railroad thus to depress its tracks. The portion of the yards where plaintiff's accident occurred was in a heavily populated area and had numerous industries adjacent to the tracks.

Plaintiff admitted that both his grandmother and his mother had warned him not to go down in the yards; that his teacher also had told him not to go around the tracks because it was a dangerous place; that he knew that if any member of his school patrol saw him going toward the depression they would stop him or report him to his teacher; and that he had been told by an engineer on a previous occasion when he was playing in the yards to keep off the railroad property as he might get hurt. In spite of all this, he and some of his companions would crawl over or through the fence on the properties above the depression and slide down the bank to the tracks, but they generally ran to cover or out of the yards if any railroad man attempted to approach them or hollered at them.

On the stand plaintiff attempted to claim that he did not realize prior to his accident that the yards were a dangerous place, but cross-examination elicited from him that he knew he "shouldn't be trying to get on to a moving train." Furthermore, it appeared that in a deposition taken before trial, when he had been asked, "You knew it was dangerous?" he had answered, "Yes, sir." And at the time he made a dash for the moving train, he in seeming daring had exclaimed to his companions, "Watch me" or "Watch this."

On all these facts and circumstances, as we have suggested, we are unable to say that the trial court was in error in holding that by the standards of Minnesota law there was no substantial evidence that could support a finding that plaintiff did not comprehend or appreciate the danger of what he attempted to do. In the Mehalek case, quoted above, 117 N.W. at page 251, the Minnesota Supreme Court had refused to give recognition to the testimony of the injured boy

(nine years old as here) that he did not realize the dangers of hopping a moving train, as against the facts and circumstances of the evidence, and had declared that "It is idle to say that he did not know it was dangerous to attempt to ride on the train, or that he did not know it was wrong to do so." Here, it was the trial court's opinion that a similar view was compelled on the facts shown, and, as the court observed, even plaintiff's very exclamation, "Watch me" or "Watch this," as he made his dash for the moving train, could hardly reasonably be regarded as expressing anything except a recognized act of daring or bravado.

The trial court held also on plaintiff's first theory of liability that, apart from whether plaintiff knew that he was doing a reckless thing, the evidence further would not support a finding that the Railroad had failed to exercise proper care to keep plaintiff and children generally out of the yards. This was in effect a declaration that the condition of clause (d) of the rule of the Restatement, that the dangers of the yards to plaintiff could effectively have been safeguarded against by the Railroad and avoided without undue inconvenience or burden, had equally not been satisfied. Plaintiff had contended that the Railroad owed the duty of building a fence along its right of way or that it should have employed sufficient guards or policemen to make certain that no children would succeed in getting into the yards.

No ordinance or statute required the yards to be fenced, and the evidence showed beyond question that any such attempted fencing of the right of way would have interfered practically with the furnishing of switching service to the spur tracks on the numerous industrial properties which were located adjacent to and along the course of the three-mile yards. Beyond this, it also was indisputable from the facts of the situation that no fence, other than a wholly insurmountable one, like a castle wall, would have served to keep plaintiff off the right of way, for he and his companions in no way heeded the obstruction presented by the guarding fences on the properties above the depression but crawled through or over them at will whenever they wanted to get into the railroad yards.

In Stendal v. Boyd, 73 Minn. 53, 75 N.W. 735, 736, 42 L.R.A. 288, 72 Am.St.Rep. 597, where it had been urged that a pond was an attractive nuisance and should have been fenced, the Minnesota Supreme Court made this pertinent comment: "A pond cannot be rendered inaccessible to boys by any ordinary means. Certainly, no ordinary fence around the lot upon which a pond is situated would answer the purpose, and therefore, to make it safe, it must either be filled or drained, or, in other words, destroyed."

On plaintiff's contention that the Railroad should have employed enough policemen to keep children out of its yards, there was testimony by a witness, on which plaintiff was relying, that in his opinion this would have been possible if the Railroad had stationed a guard at each two-block point along its three-mile right of way. The trial court declared that "under the law (of Minnesota) the railroad company in operating its trains is not required to have a policeman on duty at all times to patrol every mile of its road in order to see that trespassers do not get hurt." The Railroad did employ a force of officers, who among their other duties admittedly attempted to apprehend any children discovered in the yards, not merely to order them out but also to take them home so that their parents might be apprised and warned. Generally, however, as previously has been stated, the children darted to cover or out of the yards, whenever they saw any one attempting to approach them.

In Emerson v. Peteler, 35 Minn. 481, 29 N.W. 311, 312, 59 Am.Rep. 337, where as here it was contended that more police protection should have been provided, the Minnesota Supreme Court said: "The only ground upon which negligence is predicated in this case, as we understand it, is the failure of the defendant to provide better police supervision of the movement of cars in order to prevent children from boarding them under the temptation to ride. It is urged by counsel for the plaintiff that, if the children had understood that there was a watchman there whose special business

it was to keep them off, they would not have attempted to get on the cars, and that the mere fact that the men who were engaged about the work ordered them off when they were seen, their attention being occupied with their employment, only sharpened the impulses of the children to ride when they were not observed. But we do not think that the law required the defendant, under the circumstances, to provide police supervision to keep off intruders or trespassers for these cars, whether children or adults."

Again, in Haesley v. Winona & St. P. R. Co., 46 Minn. 233, 48 N.W. 1023, 1024, 24 Am.St.Rep. 220, it was said: " * * * the question is simply whether the defendant railway company exercised reasonable care as to children of tender years when leaving its cars with their brakes firmly set, upon the grade of the side track, a few feet distant from a level surface upon which its track ran for several hundred feet. To answer this query in the negative we must hold that it was the duty of the company to provide something more than the ordinary mode of locking its cars when placed at any point on the incline, or that it was its duty to exercise police supervision over its cars when on this particular part of the track, adequate to the danger to be apprehended,—that is, such a supervision as would keep trespassing adults and children able to release a brake, off from the same; or that, as to some uses for which a side track is specially maintained, not only 400 feet of this, but a part of every other side track in the land, similarly built and situated, must be surrendered and abandoned, in order that they may not prove dangerous, alluring, and attractive to children who have not yet arrived at years of judgment and discretion, but who are old enough to seek out railway cars as proper objects with which to amuse themselves. But if either of these things were demanded of defendant a most serious burden would be imposed, a very unreasonable thing, in fact, and in the exercise of ordinary care nothing unreasonable is required."

Again, therefore, as in the case of clause (c) of the Restatement and Minnesota rule, we cannot say that the trial court was in error in its view of the effect which would be given the present situation by the Minnesota courts under clause (d). And the trial court's application would seem to be in harmony with the explanation made of clause (d) in the comment of the Restatement on § 339: "In determining whether a particular condition maintained by a possessor upon land which he knows to be subject to the trespasses of children involves an unreasonable risk to them, the comparison of the recognizable risk to the children, with the utility to the possessor of maintaining the condition, is of peculiar importance."

The question of whether an unreasonable risk is involved necessarily depends upon a balancing of the numerical chances, nature and extent of the recognizable harm against the utility of the condition and the practical possibility of eliminating its dangers. And it cannot be said to be strange that Minnesota should declare as a matter of law that the yard involved, constructed and maintained in accordance with the ordinances of the City, and requisite to a performing of the carrier's general function, including the practical serving of the various local industries located along its right of way, clearly had such a utility, as against the chances of harm to children who might trespass on the property and occasionally hop onto some moving car, that the Railroad was entitled to operate them on a practicable basis and that it would be unreasonable to permit a jury to say that the Railroad had been guilty of a lack of ordinary care in failing to construct an insurmountable fence or wall around its three-mile domain or to encircle its tracks with such a ring of guards or policemen as to make it impossible for any child to enter upon them.

The only remaining question is whether the trial court also was entitled under Minnesota law to take plaintiff's second theory of liability from the jury—that the engineer had failed to exercise ordinary care for plaintiff's safety in the circumstances when, upon observing plaintiff make a dash for the cars, he undertook to stop the four-to-five-miles-an-hour moving train as quickly as possible by the application of the emergency brakes.

The complaint initially, as has been indicated, had oppositely charged the engineer

with having increased the speed of the train and so caused plaintiff to be injured, but on the trial plaintiff switched to the theory that instead the engineer had too suddenly stopped the train. From this, there apparently would have been no course of action that the engineer could possibly have taken, which plaintiff would not equally have charged would have constituted negligence in relation to plaintiff's injuries, and which he would not with the same vigor have contended would present a jury question. If the engineer had made no attempt to apply any brakes, it undoubtedly would have been claimed that he ought to have done so. If he had undertaken to slow down gradually and thereby perhaps lent encouragement to plaintiff to hop onto the moving cars, the contention probably would have been that he should have made a sudden stop in an effort to prevent plaintiff from mounting, or to terminate as soon as possible the peril of hanging onto a moving car.

All this is said simply to point up the basis of the trial court's ruling. Here, as the evidence showed, was an engineer who without fault of his own found himself suddenly in a situation that appeared to demand momentary action for a young boy's safety. The boy had dashed out from behind some cars and began running along the side of the string of box cars which the engine was pushing. The train was moving slowly and the engineer's reaction was to stop it as quickly as possible. Whether in the swiftly occurring scene plaintiff in fact succeeded in getting onto the grab iron of the car was in dispute, but the trial court declared that in any event, "The first impulse of a normal man under the circumstances, if he was in charge of the train, would be to immediately stop the movement." A switchman who was riding on the step of the engine also saw the plaintiff at the same instant as the engineer and began signaling for an emergency stop at the moment the engineer was applying the brakes.

Thus it was the trial court's view that, in the emergency situation in which the engineer was called upon to take momentary action, negligence could not under Minnesota law "be predicated upon the engineer's failure to bring the train to a slow stop rather than to put on the emergency brakes," because within the limited circumstances there was no basis for anyone reasonably to say that the choice was such "that the ordinary prudent person would not have made it under similar circumstances."

In his appraisal of the Minnesota law, the court relied upon Pullen v. Chicago, M., St. P. & P. R. Co., 178 Minn. 347, 227 N.W. 352, 354, where Pullen, a brakeman, had suddenly placed himself in a position of peril and upon being injured claimed that Emberson, a fellow brakeman, had been negligent in seeing Pullen's peril and not at once giving the engineer a signal to start the engine. There the court said: "Even if there had been sufficient time to start the engine, negligence cannot be predicated on the failure of Emberson to give the signal. The time was a matter of seconds and of very few seconds at most. A person who sees another suddenly and unexpectedly place himself in a position of peril is not to be charged with negligence because he fails to do instantly some particular act which might possibly have saved the other from the danger to which he had exposed himself. Pullen was placed in danger by his own rash and unexpected act, not by the act of Emberson. Emberson had no time for deliberation, and, even if the engine could have been started in time to have prevented the chain from being drawn taut across the end of the caboose, he cannot be held guilty of negligence for not thinking to give the starting signal in the brief time that elapsed."

The case of Turenne v. Smith, 215 Minn. 64, 9 N.W.2d 409, which plaintiff urges upon us as demonstrative of his right to have gone to the jury, did not involve the split-second reactions of some emergency situation, and further the conduct of the defendant in knowingly permitting a young boy to hang on the running board of his moving truck could hardly be said to be of such common normality that a court would feel able to say that this is what reasonably would have been done by the ordinary prudent person in similar circumstances.

There has been pointed out to us no other Minnesota case, and our search has found none, that can be regarded as of controlling or indicative significance in the present situation. The most therefore that can possibly be said in plaintiff's favor is that the question here may be doubtful. But we have repeatedly declared that on doubtful questions of state law, unless we have a clear conviction that the trial judge is in error, we will accept his considered appraisal of the local law of his jurisdiction. Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Globe Indemnity Co. v. Wolcott & Lincoln, 8 Cir., 152 F.2d 545, 547; Abbott v. Arkansas Utilities 'Co., 8 Cir., 165 F.2d 339, 340; Heikes v. New York Life Ins. Co., 8 Cir., 171 F.2d 460, 464; Mast v. Illinois Central R. Co., 8 Cir., 176 F.2d 157, 163; Brink's Inc. v. Hoyt, 8 Cir., 179 F.2d 355, 359. And we have treated the question whether an issue is for the court or the jury under the law of a particular state as being within the application of this rule. Northern Liquid Gas Co. v. Hildreth, 8 Cir., 180 F.2d 330, 336. See also Gutierrez v. Public Service Interstate Transp. Co., 2 Cir., 168 F.2d 678.

The trial judge's view that under Minnesota law plaintiff was not entitled to go to the jury on the facts established is not without some supporting basis in state decision and from our careful consideration of the entire matter we have no clear conviction that this appraisal of the local law is erroneous.

The judgment is affirmed.