# HELEN V. PULLEN v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY.[1]

October 25, 1929.

No. 27,385.

[1]Reported in 227 N. W. 352.

348

*Stiles & Stiles,* for appellant.
*F. W. Root, C. O. Newcomb* and *A. C. Erdall,* for respondent.

TAYLOR, C.

This action was brought under the federal employers liability act to recover for the death of Wayne Pullen alleged to have been caused by the negligence of defendant. The trial court directed a verdict for defendant on the ground that no negligence had been proved. Plaintiff appealed from an order denying a new trial.

On April 12, 1928, a freight train of 60 or more cars left Mobridge, South Dakota, for Marmarth, North Dakota, and reached its destination a little after midnight. Wayne Pullen was rear brakeman on this train and rode in the caboose attached to the rear of the train. A. R. Emberson was head brakeman and rode on the engine. Both were old, experienced railroad men. Both had been conductors but were working as brakemen at this time.

At Marmarth the main track runs east and west. North of and parallel with it are nine yard tracks numbered consecutively from 1 to 9 and spaced the distance apart usual in such yards. A "lead" track connects the east ends of these yard tracks with the main track and another "lead" track connects their west ends with the main track. At Marmarth the train was to be run onto track 3. When making this movement the engineer, fireman and Emberson rode on the engine and Pullen on the caboose. The conductor was not with them. They ran out the east "lead" onto track 3 and to the west end of that track. The engine and tender were then detached from the train, switched over the west "lead" onto track 4,

the track next to track 3 .on the north, and backed east over that track for the purpose of passing out over the east "lead." When near the east "lead" the engineer stopped the engine on a signal from Pullen, who was at the caboose. The caboose had been detached from the train, by whom does not appear, and had stopped before it had cleared the switch and its rear or east end blocked the east "lead." Emberson stepped down from the engine, and Pullen said to him that they must get the chain. A chain 14 feet and 7 inches in length and weighing 125 pounds was carried on the tender for use in moving cars on adjacent tracks and for other purposes. It had a large flat link at one end and a large hook at the other end. The engine was backed until the rear or east end of the tender was two or three feet west of the front or west end of the caboose, the engine being on track 4 and the caboose on track 3. They took the chain off the tender and Emberson asked, "Do you want to couple it on the arch bar?" The arch bar was the iron frame over the wheels at the side of the caboose and seems to have been the usual place for attaching the chain in such movements. Pullen answered, "No, we will put it on the drawbar, that will be good enough." The drawbar was in the center of the front end of the caboose. They dragged the link end of the chain to the drawbar, and Pullen raised the knuckle pin and put the link over it. They then attached the other end of the chain by the hook to the carrying iron of the drawbar on the tender. The engineer was on the north side of the engine where he could not see the chain nor those near it. Pullen took a position near the caboose where he could watch the chain, and Emberson took a position on the north side of track 4 where the engineer could see his signals. Pullen then said, "Go ahead with it." Emberson signaled the engineer "to go ahead easy," and the engine moved ahead slowly. When the slack was nearly out of the chain Pullen said, "That is good." Emberson "swung the engineer down," and the engine stopped. Pullen looked at the chain and then said, "Go ahead." Emberson signaled the engineer "to go ahead easy," and the engine again moved slowly forward, putting the caboose in motion. After it had

moved a short distance Pullen again said, "That is good." Emberson again "swung the engineer down," and the engine stopped. The caboose continued in motion. As Emberson swung the engineer down, Pullen started to go between the end of the caboose and the chain. On seeing this movement Emberson shouted, "Don't go in there." The fireman also saw the movement and also shouted to Pullen not to go in there. He went in however and was caught and crushed between the chain and the caboose.

Prior to the trial plaintiff took the depositions of Emberson and the engineer. Their testimony as given in these depositions is the only evidence concerning the happening of the accident or what caused it. The engineer being on the north side of the engine could not see Pullen nor what happened, and his testimony is confined to the movements and the manner of operating the engine, and to the fact that he heard the fireman shout, "Don't go in there," or words to that effect. Emberson testified fully as to what was said and done.

Pullen took charge of the operation and gave the directions for executing it. That his action in going between the chain and the end of the caboose was wholly unexpected is shown by the excited shouts of both Emberson and the fireman. His purpose must have been to detach the chain from the caboose. That he could pull up the slack of the chain weighing 125 pounds and detach it in the two or three seconds before it would again become taut was highly improbable. There was no need to make the attempt. He could have gone upon the platform of the caboose either before or after it was in motion and stopped it with the hand brake. He could have waited until it was stopped by the chain. He could have taken a position outside the chain. Going between the chain and the caboose was not only unnecessary but obviously dangerous in the extreme. We find no evidence of any negligence other than that of Mr. Pullen himself.

Plaintiff assigns as error rulings sustaining objections to questions asked for the purpose of impeaching Emberson. These questions were in substance whether Emberson at certain times prior

to giving his deposition had not stated that it was taken for granted by Pullen and himself that he would do the signaling and would use his own judgment in giving signals; and that Pullen had to rely on him to give the proper signals and did not see or know what signals he gave. Plaintiff claims that such statements tended to contradict Emberson's testimony that Pullen gave the direction to "go ahead," and after a short movement ahead said "that is good." We see nothing in those statements necessarily inconsistent with this testimony. It was Emberson's duty as head brakeman to give the signals to the engineer. It was Pullen's duty as rear brakeman to see that the caboose was moved to a point where it would clear the "lead" and the switch, and to give directions for the necessary movements of the engine. Both took proper positions to perform their respective duties. Both were old, experienced trainmen familiar with the duties they were to perform, and there was no need for either to tell the other what he was to do. Each would necessarily rely upon the other to perform the duties devolving upon him. But assuming that the impeaching evidence was admissible over the objection that no sufficient foundation had been laid therefor, it was not substantive evidence of the truth of the statements claimed to have been made. It could be given no effect other than to discredit Emberson. Lundberg v. N. W. Elev. Co. 42 Minn. 37, 43 N. W. 685; Rosted v. G. N. Ry. Co. 76 Minn. 123, 78 N. W. 971; also numerous cases cited in note in 21 Ann. Cas. 1238. Emberson's testimony is the only evidence offered by plaintiff to sustain her claim that the accident resulted from the negligence of defendant. Her case rests wholly upon his testimony, for there is no other evidence in the record tending to show how the accident happened or what caused it. Consequently discrediting him, instead of helping her case, would only tend to weaken the only evidence she has; and therefore the rulings complained of, even if erroneous, were not prejudicial to her.

Plaintiff claims that Emberson ought to have signaled the engineer to move the engine forward when he saw Pullen go between the chain and the caboose, and was negligent in failing to do so. Em-

berson says that the engine could not have been started on a signal from him in time to avoid the accident. Plaintiff sought to show by another witness, who had been a switchman for several years and had frequently seen such engines started, that it could have been started inside of two seconds. The evidence was excluded on the ground that the witness had not shown himself competent to estimate the time with such a degree of accuracy. Even if there had been sufficient time to start the engine, negligence cannot be predicated on the failure of Emberson to give the signal. The time was a matter of seconds and of very few seconds at most. A person who sees another suddenly and unexpectedly place himself in a position of peril is not to be charged with negligence because he fails to do instantly some particular act which might possibly have saved the other from the danger to which he had exposed himself. Pullen was placed in danger by his own rash and unexpected act, not by the act of Emberson. Emberson had no time for deliberation; and, even if the engine could have been started in time to prevent the chain from being drawn taut across the end of the caboose, he cannot be held guilty of negligence for not thinking to give the starting signal in the brief time that elapsed.

Plaintiff sought to show by witnesses not connected with the operation of the train nor present at the time of the accident that the expression, "that is good," used by Pullen, meant, when used under such circumstances, that the engine was to be slowed down sufficiently to cause slack in the chain but was to be kept moving at a rate which would keep it ahead of the caboose. The exclusion of this testimony is urged as error. The record shows that the meaning given to that expression by Emberson and Pullen was not the meaning which plaintiff would give to it. What Emberson understood it to mean is shown by the fact that each time it was used he caused the engine to be stopped. At Pullen's direction the engine was moved forward. He then said, "That is good," and Emberson signaled for a stop. At Pullen's direction the engine was again moved forward. He again said, "That is good," and Emberson again signaled for a stop. Pullen knew that when he used the expression the first time Emberson stopped the engine, which shows

that when he used it the second time he knew that Emberson understood it to mean that the engine was to be stopped.

As we find no evidence of negligence on the part of defendant and no reversible errors in the record, the order is affirmed.

