MONTE HARDEN AND OTHERS, MINORS, BY
HAZEL J. HARDEN, THEIR MOTHER AND
NATURAL GUARDIAN, AND ANOTHER v.
THE SEVENTH RIB, INC.

247 N. W. 2d 42.

October 29, 1976—No. 45923.

*Leighton, Meany, Cotter & Enger* and *Terence L. Meany,* for appellants.

*McEachron & McEachron, Thomas S. McEachron,* and *John A. McEachron, Jr.,* for respondent.

Heard before Rogosheske, MacLaughlin, and Marsden, JJ., and considered and decided by the court en banc.

PER CURIAM.

Plaintiffs, wife and children of decedent Warren Harden, brought this dram shop action against defendant, The Seventh Rib, Inc., seeking damages under Minn. St. 340.95 as a result of Warren Harden's death in a single-car accident on November 30, 1973. The vehicle which Harden was driving, after he had consumed alcoholic beverages at defendant's bar, left Mower

County Road No. 14 and crashed and burned in an adjoining field. The only issue presented is whether, on the facts of this case, the trial court committed reversible error in refusing to permit certain cross-examination concerning a collateral issue.

On the evening of his death, when decedent Harden left his home at about 7:30 p. m. he had consumed no alcoholic beverages. He met Galen Christopherson at the Travel Inn located at Le Roy, Minnesota, and the two drove from there to defendant's tavern, the Seventh Rib, located at Racine, Minnesota, approximately 25 miles from Le Roy. It appears that Christopherson had been drinking before meeting Harden. They arrived at the Seventh Rib at approximately 8:30 p. m. and left at 10 p. m. The police were notified of the fatal accident at 10:25 p. m. After the accident, Harden's body was removed to a local mortuary, where a blood sample was taken. The sample disclosed an alcohol content of .18 percent. A chemist from the Minnesota Bureau of Criminal Apprehension, called by the plaintiffs, testified that to reach such a level, a man of Harden's weight would have to consume 18 to 19 1-ounce, 86-proof drinks over a 4-hour period. Christopherson's blood-alcohol level, tested at the Mayo Clinic an hour after the accident, was .517 percent.[1]

In order to prove that Harden was served at the Seventh Rib while he was, in the words of Minn. St. 340.14, subd. 1a, "obviously intoxicated," plaintiff elicited testimony about the nature of the accident and also the testimony of the chemist that most—but not all—people with a .18-percent blood-alcohol content would show outward signs of intoxication.[2] He testified that those who are not likely to show intoxication are those who are accustomed to drinking and have a higher than average

---

[1] This figure is normally more than enough to kill. See Oliphant, Nichols, Neunefeldt, and Abuzzahab, Driving While Intoxicated, p. 19. The clinic ran two tests on Christopherson in order to verify the figure.

[2] An expert witness called by the defendant similarly testified that some people, albeit a small percentage, would not exhibit obvious signs of intoxication with such a blood-alcohol level.

tolerance to alcohol. Plaintiffs' other witnesses testified that Harden was used to drinking, had a high tolerance for alcohol, and could consume a good deal of alcohol without appearing intoxicated.

The owners and employees of defendant Seventh Rib testified that decedent Harden was sober when they observed him either prior to or as he left that establishment. The testimony indicates that he had consumed only two drinks. Three patrons also testified that Harden did not appear intoxicated. Those same owners and employees, however, had previously testified in their depositions that *both* Harden and Christopherson were sober when they observed them either prior to or as they left the Seventh Rib. As to Christopherson, at least, this testimony seems incredible. His .517-percent blood-alcohol content indicated he had consumed an extraordinary quantity of alcohol sufficient to kill most people and to anesthetize the rest.

Plaintiffs attempted to question defendant's witnesses concerning their observations of Christopherson, expecting that they would testify consistently with their deposition testimony. Had they done so, the credibility of their testimony about Christopherson would have been greatly diminished by the evidence of his blood-alcohol content, and consequently the credibility of their testimony about Harden's sobriety would have been lessened as well. The trial court refused to permit plaintiffs to question the witnesses concerning their observations of Christopherson, ruling that it was a collateral issue and would only serve to confuse the jury. The jury, upon special verdict, found that Harden was not sold any intoxicating liquor while obviously intoxicated.

1. In Paddock v. Kappahan, 41 Minn. 528, 43 N. W. 393 (1889), we established the rule that a witness may not be impeached on a collateral issue. This rule was soon thereafter modified to provide that it is within the discretion of the trial judge to allow cross-examining on collateral matters. Drew v. Carroll, 120 Minn. 478, 139 N. W. 953 (1913); Campbell v.

Aarstad, 124 Minn. 284, 144 N. W. 956 (1914); State v. Jenkins, 171 Minn. 173, 213 N. W. 923 (1927); Greene v. Mathiowetz, 212 Minn. 171, 3 N. W. 2d 97 (1942). The test of collaterality, as set forth in Campbell, is whether the cross-examining party would be entitled to prove the fact as a part of his case tending to establish his cause of action or defense.[3] Under this test, the witnesses' observations of Christopherson were patently collateral, for plaintiffs could not have introduced evidence concerning Christopherson's intoxication in order to prove Harden's intoxication. Whether Christopherson was intoxicated was irrelevant to the only issue in the case: Was Harden obviously intoxicated when served by defendant's employees? Because the evidence went to a collateral issue, its admission was a question addressed to the sound discretion of the trial court.

Wigmore suggests, however, there are two classes of facts not collateral even under the above test, one of which is facts discrediting the witness in respect to bias, corruption, skill, knowledge, and so on. 3A Wigmore, Evidence (Chadbourn Rev. 1970) §§ 1005, 1022. Thus, in § 1005(f) Wigmore states:

"A necessary qualification in a witness is personal knowledge, i. e., an opportunity, as to place, time, proximity, and the like, to observe the event or act in question (§650 *supra*), and the deficiency of such opportunity may be shown to discredit (§994 *supra*). Hence, *all facts which bear upon* the position, distance, and surroundings, *the bystanders and their conduct,* the time and the place, the things attracting his attention, *and similar circumstances, said by the witness to have been observed by him at the time of observing the main event testified to by him, are material to his credit* in so far as they purport to have formed a part of the whole scene to his observation; thus, *if an error is demonstrated in one of the parts observed, the inference (more or less strong) is that his observation was erroneous*

---

[3] Wigmore notes that this test was enunciated in Attorney-General v. Hitchcock, 1 Exch. 91 (1847). 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 1020.

*(or his narration manufactured) on the other and more important parts also.*

"This source of discredit is of vast importance in the overthrow of false or careless testimony; and its permission must be provided for in any definition of the term 'collateral' * * *." (Italics supplied.)

The Wigmore formulation was applied in Commonwealth v. Franklin, 366 Mass. 284, 318 N. E. 2d 469 (1974), in which the defendant was accused of rape. The issue was the identity of the rapists. The victims had identified the defendant and one other man as the assailants, but on the morning of trial they had stated that they were mistaken in their identification of the other man and had withdrawn the identification. The trial then proceeded against the defendant alone. When the victims took the stand and identified the defendant as an assailant, the defendant's counsel attempted to impeach their identification by questioning them concerning their identification of the other man. The trial judge refused to permit such cross-examination, ruling that it went to a collateral issue. This ruling was technically correct, because the question of the identification of the second assailant was irrelevant to the issue there at hand: Did the defendant do it? The Supreme Judicial Court reversed, however, stating (366 Mass. 289, 318 N. E. 2d 472):

"* * * In so far as the record discloses, every factor which made it possible for the victims to identify one of the two criminals, or to be mistaken as to the identity of one, applied equally to the other criminal. Therefore, those factors which caused the victims mistakenly to identify one participant would be relevant in assessing the reliability of the identification of the defendant. We emphasize the significant fact that the mistaken identification had been made under oath.

\* \* \* \* \*

"In this context, it seems that a showing that the two principal Commonwealth witnesses had mistakenly identified a second man as the other assailant whom they had seen under identical

circumstances as the defendant might well have been substantially helpful to the defendant's case."

We are persuaded that in the case at bar "the rules of evidence were applied * * * with an inflexibility not to be entirely approved." Independent School Dist. No. 35 v. A. Hedenberg & Co. Inc. 214 Minn. 82, 94, 7 N. W. 2d 511, 518 (1943). The witnesses who were owners and employees of the Seventh Rib had seen both Harden and Christopherson under identical circumstances. They testified under oath that both Harden and Christopherson were sober when they left defendant's establishment. Another witness, however, was willing to testify for plaintiffs that Christopherson was intoxicated when he left the Travel Inn to go to the Seventh Rib, and yet another witness testified that Christopherson's blood-alcohol content was .517 percent—enough to kill and certainly enough to render him unconscious. From these facts may be drawn a striking inference as to the veracity of defendant's witnesses. As we have stated, if evidence is relevant in distinguishing the true from the false, it is admissible in the discretion of the trial judge even if of a collateral nature. Sullivan v. Minneapolis St. Ry. Co. 161 Minn. 45, 200 N. W. 922 (1924); State v. Upson, 162 Minn. 9, 201 N. W. 913 (1925).[4] On the facts of this case, considering the special nature of the evidence sought to be presented to the jury, it was an abuse of discretion to exclude the evidence solely because it went to a collateral issue.[5]

---

[4] See also, Svensson v. Lindgren, 124 Minn. 386, 145 N. W. 116 (1914); Farmers & Merchants Nat. Bank of Ivanhoe v. Przymus, 161 Minn. 85, 200 N. W. 931 (1924).

[5] Defendant's argument that plaintiffs are estopped from claiming error on this ground because they entered into a stipulation concerning the limited admissibility of Christopherson's blood-alcohol content is groundless. Throughout the course of the proceedings plaintiffs attempted to question defendant's witnesses concerning their observations of Christopherson and requested the court to permit cross-examination on this issue. The court denied these requests. Then, after Christopherson himself testified about the events of that evening, plain-

2. Even though the district court erred in excluding the proffered evidence, we nevertheless affirm the judgment of the district court. Permitting the plaintiffs to impeach the owners and employees of the defendant serves only to discredit their testimony in the eyes of the jury; it does not provide substantive, affirmative evidence that Harden was obviously intoxicated when he was served.[6] As to this, the plaintiffs have no evidence save the decedent's blood-alcohol content of .18 percent, a level at which most—but not all—people would probably show signs of intoxication.

In Jaros v. Warroad Municipal Liquor Store, 303 Minn. 289, 227 N. W. 2d 376 (1975), we ruled that evidence of a .28-percent blood-alcohol content—.10 percent beyond what Harden's was in the case at bar—established a strong prima facie case of intoxication when coupled with additional evidence such as the 5½ hours the decedent in that case spent in the bar and the disorientation he apparently suffered. In the instant case Harden had spent approximately 1½ hours in the Seventh Rib, evidenced no disorientation, and had a blood-alcohol content substantially less than that of the decedent in Jaros. Three patrons also testified that Harden did not appear intoxicated. Both of the expert witnesses testified that some people accustomed to drinking—which Harden was—could have a blood-alcohol content of .18 percent and not appear intoxicated. On these facts, we are not prepared to hold that evidence of an .18-percent blood-alcohol content is sufficient in and of itself to establish a prima facie case of obvious intoxication. Consequently, because impeachment of the defendant's employees would not have provided

tiffs sought to introduce evidence of his blood-alcohol content to impeach his testimony. The court allowed the evidence for that limited purpose. At no time did plaintiffs agree or stipulate that the issue of the witnesses' observations of Christopherson were irrelevant.

[6] State v. McLaughlin, 250 Minn. 309, 84 N. W. 2d 664 (1957); Ackerman v. Motor Sales & Serv. Co. 217 Minn. 309, 14 N. W. 2d 345 (1944); Pullen v. Chicago, M., St. P. & P. Ry. Co. 178 Minn. 347, 227 N. W. 352 (1929); Hicks v. Stone, 13 Minn. 398 (434) (1868).

substantive evidence for the plaintiffs, even had plaintiffs been permitted to introduce the proffered evidence, it would have been insufficient to support a jury award in their favor, for any such award would have been based upon impermissible speculation. As we said in Porter v. Grennan Bakeries, Inc. 219 Minn. 14, 20, 16 N. W. 2d 906, 909 (1944):

"* * * Error in excluding material evidence is no ground for a new trial when, taking into consideration all the evidence in the case, including that erroneously excluded, the verdict rendered, whether directed by the court or returned by the jury, was the only one warranted by the law applicable to the case. First Nat. Bank v. Malmquist, 158 Minn. 140, 197 N. W. 271; 5 Dunnell, Dig. & Supp. § 7182. This is such a case."

Affirmed.